PRESENT: All the Justices

THE FUNNY GUY, LLC, ET AL.

                                                                    OPINION BY

v. Record No. 160242                      JUSTICE D. ARTHUR KELSEY
                                                           February 16, 2017

LECEGO, LLC, ET AL.

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Daniel E. Ortiz, Judge

This case involves only one underlying dispute: The Funny Guy, LLC contends that it was not paid for work it did for Lecego, LLC.[1] That dispute, however, generated three cascading theories of recovery against Lecego. Funny Guy first claimed that, after the dispute arose, Lecego agreed to pay almost all (about 97%) of the money that it allegedly owed as part of a settlement agreement (the settlement theory). Funny Guy filed suit on that theory and lost because the trial court found that no such settlement ever existed.

After that theory proved unsuccessful, Funny Guy filed a second suit claiming that the initial promise to pay constituted a binding contract (the oral-contract theory) and argued alternatively that Lecego should pay anyway even if no binding contract existed (the quantum-meruit theory). The trial court dismissed the second suit because these two alternative theories of recovery could have been, and thus should have been, asserted in the first suit. On appeal, Funny Guy contends that the trial court erred in dismissing this second suit on the basis of res judicata. We disagree and affirm.

I.

In 2014, Funny Guy sued Lecego and claimed that, from 2012 to 2013, Funny Guy had "provided certain information technology and related services" pursuant to a contract with

---

[1] For the sake of convenience, we refer to The Funny Guy, LLC and the other plaintiff, Mark Goldstein, as "Funny Guy" and Lecego, LLC and the other defendants as "Lecego."

Lecego.  J.A. at 312.[2]  When the parties terminated their agreement, a dispute arose over payment for Funny Guy's services and other issues.  Funny Guy alleged that Lecego had agreed to pay approximately 97% of the fees claimed (amounting to $73,290) in an "attempt to resolve" the dispute but later refused to do so.  *Id.* at 312-14.  Finding there was "no meeting of the minds as a matter of law" on the alleged compromise of the payment dispute, the trial court sustained Lecego's demurrer.  *Id.* at 406.

Less than a year later, Funny Guy again sued Lecego asserting two alternative theories of recovery, breach of contract and quantum meruit.  This second complaint, like the first, alleged that Funny Guy had performed work for Lecego but was never paid for it.  *Compare id.* at 6, *with id.* at 312, 314.  Seeking $75,790,[3] Funny Guy alleged that Lecego breached its oral agreement to pay for the services and that, even if there were no oral agreement, Lecego should still make the requested payment under quantum-meruit principles.  Lecego filed a plea in bar and contended that res judicata precluded Funny Guy's second suit because these alternative theories of recovery could have been, and thus should have been, asserted in the first suit.  The trial court agreed and dismissed the second suit with prejudice.  *See id.* at 245, 300-01.

## II.

The trial court correctly reasoned that Rule 1:6 prohibited Funny Guy from filing two separate lawsuits when one would have been perfectly sufficient.  Drafted to have a pragmatically broad reach, Rule 1:6 revived the historic principles of res judicata and applied

---

[2] The other defendants named in Funny Guy's 2014 complaint were Heather Cogdell, the sole owner of Lecego; Vision-IT, Inc.; and Toni Shannon, the sole owner of Vision-IT.  *See* J.A. at 310-12.  These are the same defendants Funny Guy has named in the present suit.  *See id.* at 1-3.

[3] The $2,500 difference between the ad damnum clauses of the two suits merely reflected Funny Guy's offer during settlement negotiations to reduce its claim by $2,500 "as a showing of good faith."  *Id.* at 368.

them to modern litigation.  *See infra* Part II.B.  Both the text and historical context of Rule 1:6

calibrate its scope to Virginia's statutes governing pleading and joinder of claims.  Because

Funny Guy could have joined all three of its claims in a single suit and no disqualifying principle

of res judicata applies, Rule 1:6 prohibited Funny Guy from filing a second suit after losing its

first suit on the merits.

Funny Guy's argument to the contrary treats this case as two wholly separate disputes:

Lecego's initial promise to pay, on one hand, and Lecego's promise to pay what it had earlier

promised to pay, on the other.  We find this distinction artificial and overly formalistic.  This

analysis comes uncomfortably close to reconstituting the "same evidence" test applied in *Davis*

*v. Marshall Homes, Inc.*, 265 Va. 159, 166-68, 171, 576 S.E.2d 504, 507-08, 510 (2003), that

Rule 1:6 expressly rejected.  For purposes of res judicata, the task of categorizing the cluster of

facts that define a dispute is a pragmatic exercise that focuses on how the parties, not legal

dictionaries, would view the conflict.  From this perspective, there is no reason to subject the

parties — and the judicial system — to two separate lawsuits to resolve one underlying dispute.

A.

The exact origins of res judicata cannot be found in any "statute or rule of the common

law."  Martin P. Burks, Common Law and Statutory Pleading and Practice § 357, at 672 (T.

Munford Boyd ed., 4th ed. 1952).[4]  Some contend that res judicata "bears a close resemblance to

the [plea of] *exceptio rei judicatae* of the Roman law."  Robert von Moschzisker, *Res Judicata*,

38 Yale L.J. 299, 299 (1929).  "The Roman principle, based on the solemnity of the judicial

pronouncement, was early adopted in English law, developing into the principle now known as

---

[4] Throughout this opinion, we borrow from observations made elsewhere.  *See generally* D. Arthur Kelsey, *The Thing Decided: Rule 1:6's Rediscovery of Res Judicata in Virginia*, 34 VBA News J., no. 2, June/July 2008, at 18.

3

merger and bar."  Note, *Developments in the Law — Res Judicata*, 65 Harv. L. Rev. 818, 820

(1952) (footnote omitted).[5]  "It is not too much to say that [res judicata] is a fundamental concept

in the organization of every jural society."  2 Black, *supra* note 5, § 500, at 760.[6]  It protects not

only parties from having to try the same case twice but also society from having to pay the

institutional cost of adjudicating needlessly fragmented litigation.[7]

Res judicata involves both issue and claim preclusion.  *See generally Lee v. Spoden*, 290

Va. 235, 245-46, 776 S.E.2d 798, 803-04 (2015).  Issue preclusion bars relitigation of common

factual issues between the same or related parties.  "Under the concept of collateral estoppel, 'the

parties to the first action and their privies are precluded from litigating [in a subsequent suit] any

issue of fact actually litigated and essential to a valid and final personal judgment in the first

---

[5] Some scholars discount the historical lineage and see the doctrine as a natural phenomenon in nearly every legal system.  *See* 2 Henry Campbell Black, A Treatise on the Law of Judgments, Including the Doctrine of Res Judicata § 500, at 760 (2d ed. 1902); Robert C. Casad & Kevin M. Clermont, Res Judicata: A Handbook on its Theory, Doctrine, and Practice 6 (2001) ("Some other commentators find roots in Germanic, Roman, and other ancient systems.  But in truth these are analogies rather than roots.  Each legal system seems to produce its own res judicata law . . . .").

[6] *See also Hart Steel Co. v. Railroad Supply Co.*, 244 U.S. 294, 299 (1917) ("[R]es judicata is not a mere matter of practice or procedure inherited from a more technical time than ours.  It is a rule of fundamental and substantial justice, 'of public policy and of private peace,' which should be cordially regarded and enforced by the courts . . . .").

[7] *See Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("[R]es judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication."); *Bill Greever Corp. v. Tazewell Nat'l Bank*, 256 Va. 250, 254, 504 S.E.2d 854, 856-57 (1998) ("Courts have imposed a rule prohibiting claim-splitting based on public policy considerations similar to those underlying the doctrine of *res judicata*:  avoiding a multiplicity of suits, protecting against vexatious litigation, and avoiding the costs and expenses associated with numerous suits on the same cause of action."); *Bates v. Devers*, 214 Va. 667, 670, 202 S.E.2d 917, 920 (1974) ("[R]es judicata rests upon considerations of public policy which favor certainty in the establishment of legal relations, demand an end to litigation, and seek to prevent the harassment of parties." (citation omitted)).

action.'" *Rawlings v. Lopez*, 267 Va. 4, 4-5, 591 S.E.2d 691, 692 (2004) (alteration in original) (citation omitted). Claim preclusion, on the other hand,

> bars the assertion of legal or equitable rights of action, *even if they were not specifically resolved in earlier litigation. . . .* Called "merger" when the claimant wins the first suit and "bar" when the claimant loses it, claim preclusion under the doctrine of res judicata treats unasserted claims as being subsumed in the disposition of the related, previously adjudicated, claims.

Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 14.11[B][5], at 1214 (6th ed. 2014) (emphasis in original).

For all of the legal argot making the doctrine sound tiresomely erudite, the thought is really no more complicated than saying that, as Henry Black put it, litigants must "make the most of their day in court." 2 Black, *supra* note 5, § 731, at 1096. With equal clarity, it could also be said: "The law should afford one full, fair hearing relating to a particular problem — but not two." Kent Sinclair, Guide to Virginia Law & Equity Reform and Other Landmark Changes § 11.01, at 246 (2006).

Claim preclusion has always been the stepchild of pleading and joinder rules. "Determining which claims *should* have been brought in earlier litigation largely depends on which claims *could* have been brought." *Id.* § 11.2, at 247 (emphases in original); *see also* 2 Black, *supra* note 5, § 618, at 944-45. "Early American res judicata doctrine evolved in the shadow of these pleading rules and statutes that limited what one could litigate in a single case." Sinclair, *supra*, § 11.2, at 248. "The plaintiff, in order to have an effective remedy in the common law courts, must have been able to fit his problem into or within one of the fixed, established original writs or forms of actions," which "dictated the type of process, the content of the declaration (the first pleading), the method of proof, and the type of remedy." W. Hamilton Bryson, Bryson on Virginia Civil Procedure § 6.02[2], at 6-7 to 6-8 (4th ed. 2005); *see also*

5

Henry John Stephen, A Treatise on the Principles of Pleading in Civil Action 5-7 (Francis J. Troubat ed., 8th Am. ed. 1859).

"At common law, joinder of tort and contract claims was forbidden." Sinclair & Middleditch, *supra*, § 8.6[B], at 706-07. Similar nonjoinder rules arose from the separation of law and equity.[8] Before the federal courts merged law and equity, legal and equitable claims "could not be united in the same suit in a court of the United States." *Cherokee Nation v. Southern Kan. Ry.*, 135 U.S. 641, 651 (1890).[9] "[Some] jurisdictions, like Virginia, permitted legal claims to be asserted in a chancery suit under the 'clean up' doctrine, but only at the price of forfeiting the historic right to a jury." Sinclair, *supra*, § 11.2, at 248.[10] Although an equity court could grant legal remedies to achieve complete justice between the parties, the opposite was not true. A law court could not hear a claim for equitable remedies. *See Simmons v. Miller*, 261 Va. 561, 570 n.1, 544 S.E.2d 666, 672 n.1 (2001) (noting that an equitable action "may not be brought on the law side of the court"). The common-law doctrine of claim preclusion mirrored these inflexible pleading and joinder rules.

---

[8] *See generally* 18 Charles Alan Wright et al., Federal Practice and Procedure § 4410, at 277 (3d ed. 2016) ("The merger of law and equity into a single civil action provides the most dramatic demonstration of the impact of procedural reform on claim preclusion. . . . Claim preclusion requires what merger has made possible. Demands for equitable and legal remedies on a single claim or cause of action must be advanced in the first action or lost." (footnote omitted)).

[9] *See also* Restatement (Second) of Judgments § 26 cmt. c(2) (1982) (noting that when "a plaintiff in earlier times was disabled from presenting his full claim in a single action because of formal inhibitions imposed by the historical division between 'law' and 'equity,' or the forms of action, or related procedural modes," the "rules of merger and bar reflected those disabilities and in various situations permitted a plaintiff to present in a second action what he was disabled from presenting in the first").

[10] *See also Wright v. Castles*, 232 Va. 218, 222, 349 S.E.2d 125, 128 (1986) ("In equity, a litigant has no constitutional right to trial by jury, and, absent a plea in equity, no statutory right." (citations omitted)); 1 Dan B. Dobbs, Law of Remedies § 2.6(4), at 169-70 (2d ed. 1993); Sinclair & Middleditch, *supra*, § 3.7[H], at 335; *see, e.g.*, *Packett v. Herbert*, 237 Va. 422, 424 n.5, 377 S.E.2d 438, 441 n.5 (1989).

> Because what could have been brought in the former suit should have been brought, the merger-bar principle of claim preclusion depended on the procedural constraints on the first suit. If the later asserted claim could not [have been] raised in the earlier trial or, if it could have been raised, but at an unacceptably high juristic cost (like losing the right to a jury), claim preclusion permitted the second trial — no matter that both trials involved the same contest between the same litigants. Though antithetical to the policies underlying res judicata, the second trial was a necessary accommodation of confused and peculiar procedural rules governing pleadings and joinder.

Sinclair, *supra*, § 11.2, at 248-49.

Over time, courts developed analytical shortcuts to decide the easy cases. One of the most popular was the "same evidence" formulation. *See* Restatement of Judgments § 61, at 240 (1942) (stating that "the plaintiff is precluded from subsequently maintaining a second action based upon the same transaction, if the evidence needed to sustain the second action would have sustained the first action"). The first Restatement of Judgments applied this test to determine what constituted a single transaction for purposes of res judicata. However, "[a]lthough the 'same evidence' standard was '[one] of the tests' used at the time, it was not the only one." *Nevada v. United States*, 463 U.S. 110, 130 n.12 (1983) (second alteration in original) (quoting *The Haytian Republic*, 154 U.S. 118, 125 (1894)).

This shortcut made clear when res judicata doubtlessly applied to preclude the second suit but said nothing about when it did not apply. In this way, the same evidence formulation was "a test for inclusion" rather than as a "test for exclusion." Casad & Clermont, *supra* note 5, at 66. Though the point was lost on some courts, the first Restatement explicitly stated:

> Although it is true that the judgment in the prior action precludes the plaintiff from subsequently maintaining the second action based upon the same transaction if the evidence needed to sustain the second action would have sustained the first action, *the negative is not true. Although the evidence needed to sustain the second action would not have sustained the first action, the*

7

*plaintiff may be precluded by the judgment in the first action from maintaining the second action.*

Restatement of Judgments § 61 cmt. a, at 240 (emphasis added).

> Identity of evidence supporting the two causes can show that the second action is so closely related to the first that only one lawsuit should be permitted. The lack of identity of evidence, however, does not necessarily mean that the second action should be allowed. Many cases recognized this, and this is the view reflected in the Restatements. Accordingly, other criteria have to be used to determine whether a second action should be precluded when it did not depend upon the same evidence that would have supported the first action.

Casad & Clermont, *supra* note 5, at 66 (footnotes omitted).

"Definitions of what constitutes the 'same cause of action' have not remained static over time," *Nevada*, 463 U.S. at 130, and thus, res judicata had to expand to parallel modern pleading and joinder reforms.[11] "In perfect symmetry, as the could-have-litigated category broadened, so too did the reach of the should-have-litigated principle." Sinclair & Middleditch, *supra*, § 14.11[B][5], at 1218-19. The second Restatement of Judgments reflects this broad view of res judicata, under which a prior final judgment on the merits of a cause of action extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgments § 24(1). Moreover,

> What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are

---

[11] As the second Restatement of Judgments explains: "In defining claim to embrace all the remedial rights of the plaintiff against the defendant growing out of the relevant transaction (or series of connected transactions), this Section responds to modern procedural ideas which have found expression in the Federal Rules of Civil Procedure and other procedural systems." Restatement (Second) of Judgments § 24 cmt. a. "Many preclusion rules are closely entwined with rules of procedure, and the civil rules often are clearly intended to require preclusion." 18B Wright et al., *supra* note 8, § 4472, at 376 (2d ed. 2002).

related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Id.* § 24(2); *see also* Sinclair & Middleditch, *supra*, § 14.11[B][5], at 1220, 1222.  Because the transactional approach is consistent with the reasoning underlying early res judicata doctrine, it represents a refinement of, and not a departure from, traditional res judicata principles.

B.

Virginia law has historically recognized that a litigant must unite every joinable claim that he has against a particular defendant in one proceeding or risk the preclusion of his other claims.  "Every litigant should have opportunity to present whatever grievance he may have to a court of competent jurisdiction; but having enjoyed that opportunity and having failed to avail himself of it, he must accept the consequences." *Miller v. Smith*, 109 Va. 651, 655, 64 S.E. 956, 957 (1909).  Thus, the "effect of a final decree is not only to conclude the parties as to every question actually raised and decided, but as to *every claim which properly belonged to the subject of litigation* and which the parties, by the exercise of reasonable diligence, might have raised at the time." *Smith v. Holland*, 124 Va. 663, 666, 98 S.E. 676, 677 (1919) (emphasis added).[12]  "Several statements of this underlying principle go back to the earliest formulations of

_____

[12] *See also Gimbert v. Norfolk S. R.R.*, 152 Va. 684, 689-90, 148 S.E. 680, 682 (1929) (stating that merger-bar principles made the initial resolution "conclusive of the latter not only as to every question which was decided, but also as to every other matter which the parties might have litigated and had determined, within the issues as they were made or tendered by the pleadings or as incident to or essentially connected with the subject matter of the litigation, whether the same, as a matter of fact, were or were not considered" (citation omitted)); *Diamond State Iron Co. v. Alex K. Rarig Co.*, 93 Va. 595, 603-04, 25 S.E. 894, 897 (1896) (recognizing that res judicata "applies, except in special cases, not only to points upon which the court was actually required, by the parties, to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time" (citation omitted)); *McCullough v. Dashiell*, 85 Va. 37, 41, 6 S.E. 610, 612 (1888) ("[W]here every objection urged in the second

9

Virginia res judicata law." Sinclair, *supra*, § 11.01, at 246. When a court has decided a party's claim regarding a particular "subject-matter" on the merits, that decision is "not now to be questioned in a subsequent controversy upon the same subject-matter between the same parties.'" *Washington, Ohio & W. R.R. Co. v. Cazenove*, 83 Va. 744, 752, 3 S.E. 433, 438 (1887).

Early Virginia cases applying the merger-bar principles of res judicata focused on the subject matter of the underlying dispute — not the particular legal theories asserted, alternatively pled claims, tightly defined fact patterns, or formalistic distinctions between related rights of action. *See, e.g.*, *Martin v. Columbian Paper Co.*, 101 Va. 699, 701, 44 S.E. 918, 918-19 (1903) (noting that the two suits "involve the same subject-matter, and have a common object"); *Howison v. Weeden*, 77 Va. 704, 707 (1883) ("[I]f . . . the same subject matter has been once fully passed upon, and the sentence of this court pronounced between the same parties or their privies, then it is *res judicata* . . . ."). The problem with res judicata at that time was not scope limitations on the should-have-litigated aspect of the doctrine, but procedural limitations on the could-have-litigated aspect.

---

suit was open to the party within the legitimate scope of the pleadings in the first suit, and might have been presented at that trial, the matter must be considered as having passed *in rem judicatam*, and the former judgment in such case is conclusive between the parties." (citation omitted)); *Withers' Adm'r v. Sims*, 80 Va. 651, 660-61 (1885) ("'[A]ll those matters which . . . might have been offered to sustain the particular claim or demand litigated in the prior action . . . are concluded by the judgment or decree in the former suit,' for to this extent the authorities certainly do go." (citations omitted)); *Blackwell's Adm'r v. Bragg*, 78 Va. 529, 541 (1884) ("The principle, however, extends farther. It is not only final as to matters actually determined, but as to every other matter which the parties might litigate in the cause, and which they might have had decided." (quoting *Le Guen v. Gouverneur & Kemble*, 1 Johns. Cas. 436, 492 (N.Y. 1800))); *Shenandoah Valley R.R. v. Griffith*, 76 Va. 913, 925 (1882) ("The doctrine of *res judicata* applies to all matters which existed at the time of giving the judgment or rendering the decree, and which the party had the opportunity of bringing before the court."). There were, occasionally, skeptical views to the contrary, *see, e.g.*, *Kelly v. Board of Pub. Works*, 66 Va. (25 Gratt.) 755, 759-63 (1875), but they are inconsistent with early Virginia case law.

As stated previously, a common-law plaintiff could not join tort and contract claims in the same suit. *See Kavanaugh v. Donovan*, 186 Va. 85, 93, 41 S.E.2d 489, 493 (1947); *Gary v. Abingdon Publ'g Co.*, 94 Va. 775, 779, 27 S.E. 595, 596 (1897). In Virginia, that procedural limitation disappeared with the enactment of Code §§ 8.01-272 and 8.01-281, which allow plaintiffs to join tort and contract claims and to plead alternative theories of recovery. *See Powers v. Cherin*, 249 Va. 33, 37, 452 S.E.2d 666, 668 (1995). Both statutes employ the "same transaction or occurrence" test to define which claims a plaintiff may join. Code §§ 8.01-272, -281; *see Fox v. Deese*, 234 Va. 412, 422-23, 362 S.E.2d 699, 705 (1987).[13]

As modern pleading reforms loosened the procedural limitations on res judicata, this Court, ironically, tightened the historic scope of the merger-bar principles of the doctrine. In *Davis v. Marshall Homes, Inc.*, 265 Va. 159, 576 S.E.2d 504 (2003), the Court adopted a strict view of the same-evidence test that was wholly out of sync with the prior, far broader, same-subject-matter test. The "test" to determine whether different "claims are part of a single cause of action," *Davis* stated, is "whether the same evidence is necessary to prove each claim." *Davis*, 265 Va. at 166, 576 S.E.2d at 507 (quoting *Brown v. Haley*, 233 Va. 210, 216, 355 S.E.2d 563, 567 (1987)). If the claims involve different, though related, fact patterns, *Davis* held, res judicata does not apply even if the claims all arise out of the same underlying dispute.

Commentators argued that *Davis* "redefined the doctrine of res judicata," John R. Walk, *Annual Survey of Virginia Law: Civil Practice and Procedure*, 39 U. Rich. L. Rev. 87, 91 (2004), causing it to become a "source of confusion" among experienced litigators and trial

---

[13] *See also Kamlar Corp. v. Haley*, 224 Va. 699, 707, 299 S.E.2d 514, 518 (1983). Consider, too, Code §§ 8.01-6 and 8.01-6.1, enacted in 1990 and 1996 respectively, which likewise use the same "conduct, transaction[,] or occurrence" test to determine whether an amendment to a pleading relates back to the time of filing of the initial pleading for purposes of the statute of limitations.

judges, Sinclair & Middleditch, *supra*, § 14.11[B][5], at 1216. Res judicata had become

"'unglued' in Virginia," Professor Costello stated, because "the rule was turned backwards and

became detrimental to the basic policy of *res judicata*, rather than supportive of it." John L.

Costello, Virginia Remedies § 7.11[1], at 7-40 (4th ed. 2011). One court presciently described

*Davis* as a "temporary aberration" in Virginia res judicata law. *Caperton v. A.T. Massey Coal

Co.*, 679 S.E.2d 223, 262 n.45 (W. Va. 2008), *rev'd on other grounds*, 556 U.S. 868, 890 (2009).

Though harsh, such criticisms were not unfair, as scholars have for some time lamented the

"frequent misadventures in attempting to transport 'cause of action' thinking from one

procedural context to another" until courts began to recognize "that procedural reform ha[d]

transformed the scope of claim preclusion." 18 Wright et al., *supra* note 8, § 4407, at 179.

The conceptual flaw in *Davis* was the use of the same-evidence test as a rule of

exclusion. That test asked whether "the evidence needed to sustain the second action would have

sustained the first action." Restatement of Judgments § 61 cmt. a, at 240. However, though res

judicata barred a second claim requiring consideration of the same evidence as the first claim,

"the negative is not true. Although the evidence needed to sustain the second action would not

have sustained the first action, the plaintiff may be precluded by the judgment in the first action

from maintaining the second action." *Id.* Thus, the same-evidence formulation worked only as

"a test for inclusion" rather than as a "test for exclusion." Casad & Clermont, *supra* note 5, at

66; *see also* Costello, *supra*, § 7.11[1], at 7-40.

In 2004, the Boyd-Graves Conference[14] recommended that the General Assembly enact a

statute to supersede *Davis* and to return Virginia res judicata law to the traditional same-subject-

---

[14] For an account of the history and activities of the Boyd-Graves Conference, see Jody Taylor, *Careful Study: The 100-Plus-Member Boyd-Graves Conference Meets Once a Year to Present Committee Research into Law Reforms*, 40 VBA Journal, no. 1, Spring 2013, at 33, and

matter test.  To accomplish that goal, the Conference recommended that the statute parallel the

"same transaction or occurrence" formulation in Code §§ 8.01-272 and 8.01-281 and the second

Restatement of Judgments.  In accordance with this recommendation, the Rules Advisory

Committee of the Judicial Council proposed Rule 1:6, which states, in relevant part,

> A party whose claim for relief arising from identified conduct, a
> transaction, or an occurrence, is decided on the merits by a final
> judgment, shall be forever barred from prosecuting any second or
> subsequent civil action against the same opposing party or parties
> on any claim or cause of action that arises from that same conduct,
> transaction or occurrence, whether or not the legal theory or rights
> asserted in the second or subsequent action were raised in the prior
> lawsuit, and regardless of the legal elements or the evidence upon
> which any claims in the prior proceeding depended, or the
> particular remedies sought.

Rule 1:6(A).

The Court adopted Rule 1:6 in 2006.  Under Rule 1:6, it does not matter that the second

suit includes alternative legal theories or would require evidence not present in the first suit.

Instead, Rule 1:6 parallels the "same transaction or occurrence" scope of Code §§ 8.01-272 and

8.01-281.  Thus, if the underlying dispute produces different legal claims that can be joined in a

single suit under the joinder statutes, Rule 1:6 provides that they should be joined unless a

judicially-recognized exception to res judicata exists.[15]

---

see Wiley F. Mitchell Jr., *Legal Focus/Civil Litigation: Behind the Scenes of the Boyd-Graves Conference*, 31 VBA News Journal, no. 4, Aug./Sept. 2005, at 10.

[15] All of the ordinary caveats to res judicata apply to Rule 1:6's transactional approach to merger and bar — thus preserving the historic limitations on the doctrine.  Claim preclusion, for example, does not apply to non-final judgments, *see* Restatement (Second) of Judgments § 17; to dismissals "for lack of jurisdiction, for improper venue, or for nonjoinder or misjoinder of parties," *id.* § 20(1)(a); to nonsuits and dismissals without prejudice, *see id.* § 20(1)(b); to dismissals for prematurity or some other violation of a precondition to suit, *see id.* § 20(2); to judgments that the parties have agreed or the issuing court has expressly stated should have no preclusive effect, *see id.* § 26(1)(a)-(b); to rulings made by a court lacking subject-matter jurisdiction, *see Lloyd v. American Motor Inns, Inc.*, 231 Va. 269, 271, 343 S.E.2d 68, 69 (1986); or to the unique contexts of property and personal injury damage suits "arising out of the same

C.

Applying these principles, the trial court held that the litigation between these parties arose out of a single underlying dispute: Funny Guy wants to be paid for work it did for Lecego. The trial court declined to view this contest — Lecego's initial promise to pay and its later promise to pay what it had earlier promised to pay — as two wholly separate litigable disputes. We agree. The symmetry between Rule 1:6 and the joinder statutes, coupled with the absence of any disqualifying principle of traditional res judicata law, demonstrates the correctness of the trial court's conclusion.

1.

Code § 8.01-272 specifically addresses the joinder of claims in a single lawsuit. Under this statute, a plaintiff may join multiple claims in the same proceeding (including those, like tort and contract claims, which he previously could not join) so long as they "arise out of the same transaction or occurrence." Code § 8.01-272.[16] Rule 1:4(k) further confirms that a party "may plead alternative facts and theories of recovery . . . provided that such claims . . . arise out of the same transaction or occurrence." If this condition is satisfied, a party "may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or equitable grounds." Rule 1.4(k).

Code § 8.01-281(A) reinforces the broad scope of joinder in Virginia: "A party . . . may plead alternative facts and theories of recovery . . . provided that such claims . . . arise of out of

conduct, transaction or occurrence" and claims formerly asserted in mechanic's lien proceedings, Rule 1:6(C). *See generally* 18 Wright et al., *supra* note 8, § 4415, at 381-423 (documenting recognized claim-preclusion exceptions).

[16] "[W]hile one sentence of Code § 8.01-272 is obviously limited to dealing with the combination of two sorts of claims at law (tort and contract), the first sentence of that section is not so limited; nor are Code § 8.01-281 or Rule 1:4(k) restricted to actions at law." Sinclair, *supra*, § 2.02(C), at 78-79 (footnote omitted).

14

the same transaction or occurrence." Subsection B acknowledges the trial court's discretion to conduct separate evidentiary hearings if doing so is more prudent or efficient. *See* Code § 8.01-281(B); *see also infra* note 20. The authority to sever recognizes that, particularly with alternative claims, resolving one claim might moot all the others. Equally so, the different evidentiary requirements of each claim that could potentially prejudice a party regarding another claim could provide a sound basis for a trial court to exercise its authority to sever the claims under Code § 8.01-281(B).

Code §§ 8.01-272 and 8.01-281, along with Rule 1:4(k), permit joinder of claims on the precondition that they arise out of the "same transaction or occurrence" — the exact phrase used in Rule 1:6(A) to define the scope of res judicata (but for the addition of the word "conduct" in Rule 1:6).[17] By their very terms, "[b]oth enactments are conditioned . . . upon the requirement that the claims joined must 'arise out of the same transaction or occurrence.'" *Powers*, 249 Va. at 37, 452 S.E.2d at 669. In other words, absent agreement of the parties, claims can *only* be joined *if* they arise out of the same transaction or occurrence. If claims can truly be joined under Code §§ 8.01-272 and 8.01-281, then it necessarily follows that the very same claims would be prima facie within the scope of Rule 1:6. That is the symmetry intended when the phrase "conduct, transaction or occurrence" was repeated essentially verbatim in Rule 1:6. Rule 1:6 thus "effectuates Code §§ 8.01-272 and 8.01-281" and "applies the *same test* in res judicata issues." Sinclair & Middleditch, *supra*, § 14.11[B][5], at 1220 (emphasis added).

---

[17] "The phrase, 'conduct, transaction or occurrence' is well tested in American law as well as Virginia practice," and the "drafters of Rule 1:6 felt strongly that using this established three-part definition [same conduct, transaction or occurrence] would be the most clear and readily applied formula, lending predictability and stability to the doctrine. The Judicial Council unanimously agreed." Sinclair & Middleditch, *supra*, § 14.11[B][5], at 1219.

15

We applied the "transaction or occurrence" standard in *Fox v. Deese*, 234 Va. 412, 422-23, 362 S.E.2d 699, 705 (1987). *Fox* adopted a "broad restatement" of this standard by linking multiple parties involved in "different jobs and functions with different employers, alleged to have been culpable on multiple overlapping but not congruent theories, some individually, some on respondeat superior grounds, and some on both." Sinclair, *supra*, § 2.02(B), at 76. While "[s]ome were charged with negligence, others [were charged] with fraud, intentional wrongs, or conspiracy, in transactions spanning several months of activity in different offices, over the telephone, in person, and through correspondence." *Id.* Even with this wide range of factual circumstances, *Fox* held that a "fair reading" of the complaint showed that the plaintiff "pleaded *alternative theories of recovery* against the same group of defendants and that the claims *arise out of the same transaction or occurrence*." *Fox*, 234 Va. at 423, 362 S.E.2d at 705 (emphases added). In doing so, *Fox* recognized that all of the varied circumstances orbited around one core dispute.

The claims in *Fox* involved a large cluster of facts, far more complex and expansive than this relatively simple payment dispute between Funny Guy and Lecego. Funny Guy does not attempt to say otherwise.[18] Instead, Funny Guy omits any mention of *Fox*, mistakenly believing that the statutes and Rule construed in *Fox*, Code §§ 8.01-272 and 8.01-281 and Rule 1:4(k), can be decoupled from the Rule 1:6 analysis because joinder under those statutes and that Rule is purely permissive. Joinder is permissive, of course, but that statement merely means that a trial court cannot compel a claimant, at his opponent's insistence, to assert an additional claim if he

---

[18] Our colleagues in dissent, however, do make a brief attempt to distinguish *Fox*. *See post* at 31. From the dissent's perspective, the eight claims asserted in *Fox* against five different parties all stemmed from one overriding "purpose" to "promote a concert" whereas, in our case, the three alternative claims asserted by Funny Guy did not have an overriding purpose. *Post* at 31. We disagree. The overriding purpose of both law suits at issue here was Funny Guy's desire to be paid for its work. All three of its alternative claims expressly sought that end.

16

chooses not to, even though the claim arises out of the same transaction or occurrence as the claims he has actually asserted. If the claimant chooses not to assert a joinable claim — which, under Code §§ 8.01-272 and 8.01-281 and Rule 1:4(k), can only be one arising out of the same transaction or occurrence — it is Rule 1:6, not the permissive-joinder statutes, that attaches the penalty for intentionally segmenting the litigation.

A trial court has authority to sever joinable claims and order separate evidentiary hearings in the same case. *See infra* note 20. That power to sever, however, presupposes the claims are joinable, and the claims are joinable only if they arise out of the same transaction or occurrence. The power to sever under Code § 8.01-281(B), therefore, does not support the assumption that the phrase "same transaction or occurrence" in the joinder statutes and Rule is somehow different from the nearly identical phrase in Rule 1:6.[19] As noted earlier, res judicata

---

[19] On brief and at oral argument, Lecego relied heavily on *Bates v. Devers*, 214 Va. 667, 202 S.E.2d 917 (1974), a pre-Rule 1:6 opinion from this Court, as the most factually analogous and authoritative case to support its arguments. *See* Oral Argument Audio at 6:12 to 7:03; Appellant's Br. at 7-10; Reply Br. at 10-11. In *Bates*, we held that claims under a settlement agreement were not barred by a federal court's previous adjudication regarding certain check transactions that were included within the settlement agreement. *See Bates*, 214 Va. at 672-73, 202 S.E.2d at 922. Two reasons explain why *Bates* does not contribute to our analysis in this case.

First, *Bates* relied on the same-evidence test that Rule 1:6 expressly disavowed. *See Bates*, 214 Va. at 672, 202 S.E.2d at 922 (holding that a claim based on a related but "separate" contract from the original suit was not subject to res judicata because "the evidence to support one is not necessary to support the other, but much of it that would be material to sustain the one would be irrelevant to the other" (citation omitted)).

Second, as Funny Guy conceded at oral argument, *see* Oral Argument Audio at 7:03 to 7:47, the claim under the settlement agreement allegedly barred by res judicata in *Bates* accrued after the filing of the first suit. This factual sequence renders res judicata inapplicable. *See, e.g.*, *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 328 (1955) ("While the 1943 judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."); *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1149-50 (10th Cir. 2006); *Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.*, 750 F.2d, 731, 739-40 (9th Cir. 1984); 18 Wright et al., *supra* note 8, § 4409, at 233 & n.10. In contrast, Funny Guy's

17

has historically calibrated the scope of its merger-and-bar effects to the ever-evolving rules governing pleading and joinder of claims. *See* Sinclair, *supra*, § 11.2, at 247. "Determining which claims *should* have been brought in earlier litigation largely depends on which claims *could* have been brought." *Id.* (emphases in original).

2.

For purposes of res judicata, deciding what constitutes a single transaction or occurrence under Rule 1:6 should be a practical analysis. The proper approach asks "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." Restatement (Second) of Judgments § 24(2). No "single factor" is indispensable or determinative. *See id.* § 24 cmt. b. The factors should instead be considered "pragmatically" with a view toward uncovering the true underlying dispute between the parties. *Id.* § 24(2). Under this approach, it does not matter that the claimant "is prepared in the second action (1) [t]o present evidence or grounds or theories of the case not presented in the first action, or (2) [t]o seek remedies or forms of relief not demanded in the first action." *Id.* § 25.

Every one of these pragmatic factors supports the trial court's application of res judicata in this case. The "origin" and "motivation," *id.* § 24(2), for the claims are perfectly obvious: Funny Guy wants to get paid for its work. Evaluating the "time" and "space" factors, *id.*, reveals a single payment dispute —concerning the same money for the same work —that was ongoing and uninterrupted. The three alternative theories of recovery that Funny Guy has asserted throughout this litigation (settlement, oral contract, and quantum meruit) all fit within a single factual narrative that easily forms "a convenient trial unit." *Id.* And the last factor, the "parties'

claims in this suit (breach of contract and quantum meruit) accrued before Funny Guy had ever filed the first suit for breach of the alleged settlement agreement.

18

expectations or business understanding or usage," *id.*, is the most obvious. Reasonable

commercial parties would not expect, much less want, a mere payment dispute to disintegrate

into multiple lawsuits.[20] If there is one payment dispute, reasonable commercial parties would

expect there to be one court case to resolve it. Most litigants, we believe, would view all three of

Funny Guy's alternative claims as arising out of "a natural grouping or common nucleus of

operative facts," *id.* § 24 cmt. b, thus requiring Funny Guy to "include in an action all separate

---

[20] Trying Funny Guy's putative settlement claim alongside the underlying oral-contract and quantum-meruit claims would not violate, as the dissent suggests it might, *see post* at 29, evidentiary principles forbidding a party from using an offer or acceptance of a compromise as evidence to "prove or disprove the validity or amount of a disputed claim," Va. R. Evid. 2:408(a). Funny Guy's first suit for breach of the settlement agreement proceeded to a demurrer hearing before a judge. The trial judge in that case, had all three of the alternative claims been presented, would have been able to view the settlement evidence in the proper context and not improperly use it to influence his decision, if one became necessary, on the underlying dispute allegedly subject to the settlement agreement. *See Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 397-98, 732 S.E.2d 676, 684 (2012) (recognizing that a trial court "sitting as the finder of fact 'is presumed to have excluded from its analysis of the issues all incompetent evidence' that might surface during the testimony" (alteration and citation omitted)).

And if the first suit had gone to a jury with all three alternative claims, the trial court would have had the option to sequence the presentation of the evidence, to offer the jury a limiting instruction on the proper consideration of the settlement evidence, or, as Funny Guy even recognizes, *see* Oral Argument Audio at 30:21 to 30:47, to conduct separate evidentiary hearings if the court thought the jury might not follow the limiting instruction. In fact, the trial court sequenced the evidence in this case by directing the parties to present their arguments regarding res judicata before presenting evidence regarding privity of contract. *See* J.A. at 262-65. These are the ordinary tools used by experienced trial judges in a multitude of contexts. *See, e.g.*, *Allstate Ins. v. Wade*, 265 Va. 383, 392-94, 579 S.E.2d 180, 185-86 (2003); *Fox*, 234 Va. at 423, 362 S.E.2d at 705; *Fitzgerald v. Commonwealth*, 219 Va. 266, 268-71, 246 S.E.2d 899, 901-02 (1978); *see also* Code § 8.01-272 ("The court, in its discretion, may order a separate trial for any claim."); Code § 8.01-281(B) ("The court may, upon motion of any party, order a separate trial of any claim, counterclaim, cross-claim, or third-party claim, and of any separate issue or of any number of such claims."); Va. R. Evid. 2:105 ("When evidence is admissible as to one party or for one purpose but not admissible as to another party or for another purpose, the court upon motion shall restrict such evidence to its proper scope and instruct the jury accordingly. The court may give such limiting instructions sua sponte, to which any party may object."); Va. R. Evid. 2:611(a) ("The mode and order of interrogating witnesses and presenting evidence may be determined by the court so as to (1) facilitate the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.").

instruments growing out of the same original transaction then due and held by that plaintiff," 18 Wright et al., *supra* note 8, § 4409, at 233.

3.

Other aspects of Funny Guy's reasoning fail to persuade us. Consider the correct observation that the putative settlement agreement (which the trial court held never existed) involved a slightly different amount than the alleged (but never adjudicated) oral-contract claim. The 3% difference between the two ad damnum clauses — $75,790 vs. $73,290 — apparently suggests to Funny Guy that there really were two underlying disputes, but this is not so. The difference did not reflect a dispute over how much was owed. Instead, Funny Guy and its principal offered the lesser amount "as a showing of good faith" during negotiations over the alleged settlement agreement. J.A. at 368. The only dispute between Funny Guy and Lecego was, and is, Funny Guy wanting to get paid for its work. The trifling difference between these two figures has little relevance to the res judicata analysis.

Nor does it matter, as Funny Guy contends, that the nonexistent settlement agreement included a few provisions arguably unrelated to the specific money Funny Guy claimed it was owed. These provisions merely required the parties to refrain from disparaging one another,[21] required Funny Guy to sign a close-out agreement, and required both parties to release their claims against one another under the oral contract and keep the agreement confidential. *See* J.A.

---

[21] There were two such non-disparagement provisions. The first stated: "The Parties agree that they will not disparage or criticize any other Party to any person or entity" and "will not make disparaging comments, statements, references or representations, whether oral or in writing, concerning any other Party's performance and/or conduct under the Verbal Agreement." J.A. at 343. The second stated: "Goldstein/Funny Guy agrees to provide evidence of his withdrawal of any and all negative emails, letters, claims or other form of written correspondence to any third party regarding . . . work performed" under the contract "within five (5) calendar days of the execution of this Settlement Agreement. Such proof shall include a copy of such withdrawal document and proof that such document has been sent." *Id.*

20

at 342-44. Many of these non-monetary provisions, however, arose out of the underlying oral contract. *See id.* at 343 (including a requirement to release claims "under or arising from the said Verbal Agreement," a non-disparagement provision pertaining to the parties' "performance and/or conduct under the Verbal Agreement," and a non-disparagement provision requiring Funny Guy to provide proof that it had withdrawn negative comments "regarding any matter pertaining to work performed on the . . . Contract").

More importantly, none of these non-monetary provisions changed the essential character of the purported settlement agreement. As its provisions confirm:

> IN WITNESS WHEREOF, by signing and fulfilling the requirements of this Settlement Agreement, the Parties agree that this Settlement Agreement is *full accord and satisfaction* for any and all claims now know[n] or known in the future against any party *for the work performed by [Funny Guy] on the Contract*.

*Id.* at 345 (emphases added).

> Upon receipt of the *final payment* amount of $73,290.00, the undersigned fully releases and agrees that this is a *full accord and satisfaction* for any and all claims now known or that become[] known in the future *related to the work performed by [Funny Guy] under the Contract.*

*Id.* at 330 (emphases added); *see also id.* at 342 (incorporating "Exhibit 1" by reference).

Seeking compensation for the "work performed" under the prior oral agreement, *id.* at 345, Funny Guy had "billed a total of $374,967.40, of which $299,177.40 [had] been paid." *Id.* at 342. The reference to "final payment," *id.* at 330, represents the final payment (discounted by $2,500 "as a showing of good faith," *id.* at 368, during negotiations) that Funny Guy claimed it was owed for services performed under the prior oral contract. The claim barred by res judicata — and the only issue before us on appeal — is the claim for money for services already

21

rendered, not some later ancillary dispute over Funny Guy's alleged disparagement of Lecego in the marketplace.

For these reasons, neither the difference in the ad damnum clauses nor the non-monetary provisions in the alleged settlement agreement reveal two separate transactions or occurrences for purposes of res judicata.

4.

We acknowledge and respect the views of our dissenting colleagues. We cannot, however, agree with them on several key points.

To begin, the dissent reads the settlement agreement (which, once again, the circuit court held never legally existed) to bar "an administrative claim [that Funny Guy] submitted to the Department of Homeland Security ('DHS') contracting officer under the Prompt Payment Act, 31 U.S.C. §§ 3901-3907 (2012) and other federal law." *Post* at 27 n.1. This DHS claim implicated, the dissent suggests, "possible consequences" under "section 1334 of the Small Business Jobs Act of 2010, codified at 15 U.S.C. § 637(d)(13)(C)." *Post* at 27 n.1. From there, the dissent concludes that these concerns "undoubtedly were worth more" than the $75,790 that Funny Guy claimed it was owed — thus demonstrating the "difference in consideration" between the oral contract and the purported settlement agreement. *Post* at 27 n.1.

Our problem with the dissent's argument is that Funny Guy, the appellant, has never once asserted it. We find no mention of the DHS administrative claim, the Prompt Payment Act, or the Small Business Jobs Act in any of Funny Guy's motions, briefs, or oral argument in the circuit court. Nor did the court address this contention, much less rule upon it. On appeal, Funny Guy filed a petition for appeal and two briefs on the merits, and participated in oral

22

argument before us. Even so, not once did Funny Guy make the specific argument that the dissent finds so persuasive.

We respectfully decline to address the merits or demerits of the dissent's assertion. We limit our analysis and holding to the arguments asserted by Funny Guy on appeal. *See, e.g.*, *Nolte v. MT Tech. Enters., LLC*, 284 Va. 80, 94 n.3, 726 S.E.2d 339, 347 n.3 (2012). Absent a showing of extraordinary circumstances, we will only overturn a decision of a circuit court based on arguments the appellant asserted in the lower court and reasserted on appeal, *see* Rule 5:25; *see, e.g.*, *Nolte*, 284 Va. at 94 n.3, 726 S.E.2d at 347 n.3, neither of which occurred here.

We must also disclaim the dissent's characterization of our holding. "The majority holds," the dissent states, "that *because* both causes of action had *accrued before* Funny Guy filed its October 2014 complaint, they could both have been brought together and, *therefore*, they should have been." *Post* at 28 n.2 (emphases added). It would be a mistake for our holding to be pressed into such a reductionist formula. True, res judicata does not bar a claim that does not accrue prior to the litigation triggering the bar. *See supra* note 19. But that statement does not mean, of course, that all unrelated claims of whatever nature accruing beforehand must be joined or be forever barred. *See supra* Part II.C.2 (applying the several factors of the second Restatement's transactional approach). Prior accrual is a necessary, but not an independently sufficient, condition for the application of res judicata merger-and-bar principles.

Finally, as for the consequences of our holding, the dissent declares: "*Every time* parties settle and *one of them breaches* the settlement agreement, the other party will have to prepare not only to litigate that breach but also the underlying claim, with all of its evidentiary burdens and litigation expenses." *Post* at 30 (emphases added). For two reasons, we believe that this prediction overstates the effect of Rule 1:6.

23

First, Funny Guy asserted three cascading, alternative theories of recovery, the purported settlement claim being just one of them. All of them sought to recover the same money — unpaid compensation that Lecego twice allegedly promised to pay to Funny Guy. Our holding, as our reasoning underscores, focuses on this unique factual context. Not every settlement of every conceivable underlying claim (such as common-law tort claims, statutory rights of action, or constitutional claims) will involve such direct commonality. We are addressing only the case before us. Though said many times, it bears repeating that "all statements of law are to be read in connection with the facts of the case to which they are to be applied." *Ellerson Floral Co. v. Chesapeake & Ohio Ry.*, 149 Va. 809, 812, 141 S.E. 834, 835 (1928).[22] We thus eschew the dissent's projection of our holding to all possible settlements involving every imaginable set of underlying claims.

Second, even in cases where (as here) the underlying contract and settlement claims share the requisite commonality, the only time a party suing on the settlement agreement would need to assert the underlying contract claim as an alternative theory is where (as here) the defendant disputes the very existence of the settlement agreement. If the parties accept the settlement agreement as a legally enforceable meeting of the minds, but merely dicker among themselves over whether it was breached, there would be no reason to assert an alternative claim that presupposed the settlement agreement did not legally exist because neither party would be making that assertion.

---

[22] *See also Buchanan Coal Co. v. Street*, 175 Va. 531, 536, 9 S.E.2d 339, 341 (1940) ("All statements of law applicable to a case must be read in connection with the facts." (citation omitted)); *Colvin v. Butler*, 150 Va. 672, 678, 143 S.E. 333, 334 (1928) (same); *accord Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) (explaining that "words [in judicial] opinions are to be read in the light of the facts of the case under discussion"); *Ameur v. Gates*, 759 F.3d 317, 324 (4th Cir. 2014) (same).

24

III.

In sum, Rule 1:6 was meant to echo and implement the joinder principles of Code §§ 8.01-272 and 8.01-281, and their companion, Rule 1:4(k). If alternative claims qualify for joinder under the "same transaction or occurrence" standard in these joinder statutes and this Rule, they likewise constitute res judicata under the same standard in Rule 1:6 unless a disqualifying principle of res judicata applies. This symmetry secures res judicata to its historic moorings and prohibits litigants from gaming the litigation system with multiple lawsuits involving the same underlying dispute. Because the trial court correctly applied Rule 1:6, we affirm.[23]

*Affirmed.*

JUSTICE MIMS, with whom JUSTICE GOODWYN and JUSTICE McCULLOUGH join, dissenting.

The majority holds that Funny Guy's claims for breach of the putative settlement agreement and breach of the oral agreement for services arose from the same conduct, transaction, or occurrence for the purposes of Rule 1:6. My disagreement with the majority can be reduced to one issue: the majority's position is that there is only one dispute here, involving Funny Guy's expectation to be paid for the work that it did under the oral agreement, so it can arise from only one conduct, transaction, or occurrence. I agree with Funny Guy that it has alleged two wholly separate, though sequential, disputes, and they arise from different conduct, transactions, or occurrences. I therefore respectfully dissent.

Res judicata under Rule 1:6(a) means that

> [a] party whose claim for relief arising from identified conduct, a
> transaction, or an occurrence, is decided on the merits by a final

---

[23] Our disposition of this appeal moots any necessity to address the defendants' assignment of cross-error. We thus express no opinion on it.

25

judgment, shall be forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same conduct, transaction or occurrence, whether or not the legal theory or rights asserted in the second or subsequent action were raised in the prior lawsuit, and regardless of the legal elements or the evidence upon which any claims in the prior proceeding depended, or the particular remedies sought.

As we recently noted in *Lee v. Spoden*, 290 Va. 235, 246-48, 776 S.E.2d 798, 804-05 (2015), there are three issues to resolve when deciding whether res judicata applies: (1) whether there has been a final judgment on the merits, (2) whether the parties are the same, and (3) whether the later lawsuit arises from the same conduct, transaction, or occurrence as the earlier lawsuit.

The first two prongs are clearly satisfied in this case. First, Funny Guy's suit under the settlement agreement was dismissed with prejudice on demurrer. Such a ruling is a judgment on the merits. *Griffin v. Griffin*, 183 Va. 443, 449-50, 32 S.E.2d 700, 702-03 (1945). Second, all the parties in this case are identical to those named in Funny Guy's complaint under the settlement agreement. Accordingly, only the third prong is at issue here: whether Funny Guy's suit in this action on the oral agreement arises from the same conduct, transaction, or occurrence as its suit in the action on the settlement agreement.

The settlement agreement is not part of the same transaction as the oral agreement. *See Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346, 269 S.E.2d 838, 844 (1980) (noting that "[t]he essential elements of a valid contract must exist to support a binding compromise settlement," because it is a new agreement, separate and apart from the settled underlying claim). In fact, as the majority notes, the circuit court found the settlement agreement did not exist.

The parties negotiated for a settlement agreement only after the defendants allegedly breached the oral agreement. Without the defendants' alleged breach of the oral agreement, the

settlement agreement would never have been contemplated, and the parties would not have negotiated for it. Further, the consideration for the two agreements is different. The consideration for the defendants from the oral agreement was the work Funny Guy promised to perform; the consideration for the defendants from the settlement agreement was Funny Guy's release of its claim that they breached the oral agreement, its promise not to disparage them, and its withdrawal of the critical correspondence sent to third parties.[1]

---

[1] Although the majority describes these provisions of the settlement agreement as "ancillary," they required Funny Guy to withdraw an administrative claim it submitted to the Department of Homeland Security ("DHS") contracting officer under the Prompt Payment Act, 31 U.S.C. §§ 3901-3907 (2012) and other federal law. In this administrative claim, Funny Guy asserted that Lecego and Vision-IT's prime contractor (which Funny Guy did not name as a party in either the October 2014 or June 2015 complaints) was liable for the defendants' failure to pay. The settlement agreement therefore required Funny Guy to abandon this federal law claim.

While this may seem to some as simply another attempt by Funny Guy to recover the $75,790 allegedly unpaid under the oral contract, the value to the defendants of Funny Guy's agreement to withdraw this administrative claim was undoubtedly worth more. Under section 1334 of the Small Business Jobs Act of 2010, codified at 15 U.S.C. § 637(d)(13)(C) (2012), contracting officers are required to consider a prime contractor's failure to ensure timely payment to subcontractors when evaluating the performance of the prime contractor. Thus, whether Funny Guy's claim was valid or not, two possible consequences flowed from it, and the defendants would have been right to worry about either of them. First, the claim may have led DHS to exclude the prime contractor from further contracts. Second, regardless of DHS's action, the prime contractor's embarrassment from Funny Guy's claim to DHS, or concerns about the defendants' competence raised by Funny Guy's allegations, may have led it to exclude them from further subcontracts. In either event, Funny Guy's administrative claim threatened the defendants' access to future government contract opportunities, which undoubtedly were worth more than $75,790 to them.

The difference in consideration between the oral agreement and the settlement agreement therefore is clear. So too is the additional injury Funny Guy suffered as a result of the defendants' alleged failure to perform under the settlement agreement after it had already complied with those terms.

The majority says that Funny Guy never raised this argument so we should not consider it. But Funny Guy *has* raised the argument. Its opening brief is replete with statements asserting, for example, that "[t]he ruling in Lawsuit I does not preclude Lawsuit II because Lawsuit I and Lawsuit II involve separate and distinct transactions in the form of separate and distinct *contracts*." (Emphasis in original.) The majority wants to require Funny Guy not only to say *that* the contracts are different, but specifically enumerate *how* they are different. But the

27

Similarly, the two actions do not arise out of the same occurrence. Funny Guy's cause of action for breach of the oral agreement accrued immediately upon the defendants' alleged breach of that agreement; its cause of action for breach of the settlement agreement did not accrue until both (a) the parties allegedly negotiated the settlement agreement and (b) the defendants allegedly breached it. The first occurrence (i.e., the defendants' alleged breach of the oral agreement) is not the same as the second occurrence (i.e., their alleged breach of the settlement agreement).[2]

Likewise, the two actions do not arise out of the same conduct. The conduct giving rise to the breach of the oral agreement was the defendants' alleged failure to pay Funny Guy $75,790 after Funny Guy performed the work allegedly bargained for in the oral agreement. The conduct giving rise to the breach of the settlement agreement was their alleged failure to pay Funny Guy $73,290 after Funny Guy released its claims under the oral agreement, withdrew its critical correspondence to third parties, and agreed not to disparage the defendants. The acts by the defendants constituting the conduct were different, and they were committed at different times. Further, the acts the defendants induced Funny Guy to perform through their alleged

differences between the contracts are manifestly apparent from the evidence in the record. And of course Funny Guy does not cite the Prompt Payment Act or Small Business Jobs Act of 2010 in its brief: it does not seek a state court adjudication on the merits of those federal law claims, which it withdrew while allegedly relying on the defendants' representations. Yet the requirement that Funny Guy withdraw those claims is one of the manifest differences between the two contracts.

[2] The majority holds that because both causes of action had accrued before Funny Guy filed its October 2014 complaint, they could both have been brought together and, therefore, they should have been. However, Rule 1:6 does not require two claims to be brought together if an action is filed after two separate occurrences from which they arise have occurred; rather, the Rule requires two claims to be brought together only if they arise from a single occurrence.

The majority protests that this unfairly characterizes its holding but the difference of opinion is the consequence of our differing views over whether Funny Guy's claims in this appeal arise from the same conduct, transaction, or occurrence.

promises to pay were different as well. Because the two alleged promises did not arise from the same conduct, transaction, or occurrence, res judicata is not applicable in this case.

While the majority emphasizes, and I agree, that whether claims arise from the same conduct, transaction, or occurrence should be determined pragmatically, I believe this analysis conforms to that description. According to the Restatement of Judgments (Second) § 24, this "pragmatic" determination considers "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." As noted above, the facts giving rise to the settlement agreement did not occur at the same time as those giving rise to the oral agreement. To the contrary, the settlement agreement necessarily arose from facts arising subsequent to the oral agreement.

Nor were the parties' motivations the same. The defendants' motivations when entering into the oral agreement were to procure from Funny Guy the work that contract induced it to perform for them. Their motivation when they proposed the settlement agreement was not to procure work, but to induce Funny Guy to relinquish its claim for payment under that contract, as well as to induce it to withdraw its critical correspondence to third parties.

Nor do the two claims form a convenient trial unit. The evidence that a settlement agreement exists is necessary to prevail on a claim that it was breached, while such evidence is simultaneously inadmissible in a proceeding to recover under the underlying, purportedly-settled claim. Va. R. Evid. 2:408(a). The majority contends that this conflict in the evidentiary burden for the one claim and the evidentiary exclusion for the other can be resolved with separate evidentiary hearings, or limiting jury instructions. But these arrangements are hardly reflective of a "convenient trial unit" when they amount to two trials of the separate claims.

29

Nor am I persuaded that treating a settlement agreement as a single unit with the underlying claim purportedly settled by that agreement conforms to the expectation of parties who enter into a settlement agreement. To the contrary, parties who believe that they have executed a valid settlement agreement are likely to believe that they have released the underlying claim, so that the only action they can bring is for breach of the settlement agreement. When the plaintiff to the underlying claim bargains for a written settlement agreement, he or she is exchanging a claim based on, for example, an oral contract or a claim of negligence. One of the benefits he or she receives is that he or she no longer has to prove the defendant's culpability for that underlying claim—i.e., the existence or terms of the oral contract, or the duty or standard of care breached to cause negligence. Rather, he or she must only prove the terms of the written settlement agreement and that the other party breached them, resulting in damages. Conversely, the defendant to the underlying claim exchanges all defenses to that claim in exchange for, presumably, a reduced quantum of damages. One of the benefits he or she receives is a reduction in maximum liability. And what *both* parties receive is a reciprocal benefit of avoiding the costs of litigating the underlying claim, and the risk that a jury might decide it adversely to him or her.

The majority's holding in this case deprives parties who agree to settle of all those benefits of their bargain. Every time parties settle and one of them breaches the settlement agreement, the other party will have to prepare not only to litigate that breach but also the underlying claim, with all of its evidentiary burdens and litigation expenses.[3]

---

[3] The majority opines that its holding will not affect all settlement agreements, only those where the defendant alleges that there was no settlement agreement. Even if true, the plaintiff bringing an action for breach of a settlement agreement will not know when he or she files the complaint whether the defendant will raise that defense in his or her responsive pleadings.

The majority also opines that the best understanding of whether claims arise from the same conduct, transaction, or occurrence can be gleaned from *Fox v. Deese*, 234 Va. 412, 422-23, 362 S.E.2d 699, 705 (1987).  However, as the Court's opinion in that case succinctly states, all of the claims there arose from a series of events with a single purpose:  the plaintiff's efforts to promote a concert at the Richmond City Stadium on July 4-5, 1980.  *Id.* at 416, 362 S.E.2d at 701.  The claims in Funny Guy's October 2014 and June 2015 complaints do not arise from a series of events with the same purpose.

Funny Guy's June 2015 complaint pled a cause of action that accrued in 2013, after the defendants allegedly stopped paying it.  This complaint alleged that the defendants broke a promise to pay Funny Guy for the work it performed.  Funny Guy's October 2014 complaint pled a cause of action that accrued in 2014, after the defendants allegedly breached the settlement agreement that Funny Guy (incorrectly) believed had been executed.  This complaint alleged that the defendants broke a promise to pay Funny Guy for abandoning its 2013 cause of action and withdrawing its critical correspondence to third parties, including its administrative claim to DHS—which might damage the defendants' prospects for future government contracts. I see these as two alleged broken promises, made at different times, under different circumstances, and to achieve different ends.  They did not arise from the same conduct, transaction, or occurrence.  The majority sees only one, principally by trivializing the benefits the defendants received from the second.  I disagree that the differences between the two broken promises are trivial, so that Funny Guy's suits form a single dispute.

Accordingly, I would hold that the circuit court erred by sustaining the defendants' pleas in bar on the ground of res judicata.

31