COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Athey, White and Frucci
Argued by videoconference


MAD PROPERTIES, LLC, ET AL.

v.        Record No. 1381-23-3

COUNTY OF AUGUSTA

OPINION BY
JUDGE CLIFFORD L. ATHEY, JR.
DECEMBER 30, 2024

FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
Shannon T. Sherrill, Judge[1]

Jeffrey R. Adams (Nicholas W. Dudley; Wharton Aldhizer &
Weaver, PLC, on briefs), for appellants.

Nicole M. Price, Assistant County Attorney (Kathleen A. Keffer,
Assistant County Attorney, on brief), for appellee.


Following a bench trial held in the Circuit Court of Augusta County ("circuit court") on

March 10, 2023, a judgment was entered in favor of Augusta County ("County") against MAD

Properties, LLC ("MAD Properties"), and its owner and managing member Mark Baber ("Baber")

for violating the Augusta County Zoning Ordinance ("Zoning Ordinance").  The circuit court

further enjoined MAD Properties and Baber from keeping "inoperable vehicles" out in the open on

the property without an administrative permit.  On appeal, MAD Properties assigns error to 1) the

circuit court's interpretation of the Zoning Ordinance, and 2) the circuit court granting injunctive

relief based on past violations of the Zoning Ordinance utilizing the thing-decided doctrine.  Finding

that the circuit court erred in its application of the thing-decided doctrine by declining to consider

---

[1] Judge W. Chapman Goodwin presided over the bench trial and entered the April 24,
2023 letter opinion at question in this case.

MAD Properties' affirmative defenses, we reverse the circuit court's judgment for the following reasons.

## I. BACKGROUND[2]

MAD Properties owns a one-acre parcel ("the property"), located in Augusta County on the East Side Highway in Crimora, Virginia. MAD Properties and its predecessors in interest have operated a vehicle repair business on the property since approximately 1935. When Augusta County adopted a Zoning Ordinance many years later, the property was designated within a zone permitting general business uses. Consistent with the Zoning Ordinance, MAD Properties operated a convenience store and a vehicle towing and repair facility on the property. MAD Properties eventually sought to expand its business operations on the property to include selling used vehicles to the general public. Although MAD Properties' then existing uses were permitted in the General Business District Zoning Classification, its newly intended use involving the sale of used vehicles required MAD Properties to obtain an administrative permit from the Augusta County Zoning Administrator, Sandy Bunch ("Administrator Bunch").

In 2017, MAD Properties applied for an administrative permit to operate a "Vehicle Sales Lot" on the property as required by Augusta County's Vehicle Sales Lot Ordinance.[3] Along with the permit application, MAD Properties submitted a site plan as required by the County, detailing the layout of the requested "Vehicle Sales Lot" being proposed for the property. In fact, Baber wrote on the site plan "FOR ADDING AUTO SALES USE TO EXISTING" prior to submitting the application and site plan to the County Planning Department. The site plan identified a total of twelve parking spaces with six spaces designated for customer parking and six designated for

---

[2] "Under familiar principles of appellate review, we consider the evidence in the light most favorable to the [County], the prevailing party in the trial court." *Patton v. City of Galax*, 269 Va. 219, 222 (2005).

[3] Augusta County Ordinance § 25-303(I).

displaying vehicle sales inventory. The site plan further reflected that the rear area of the property located behind MAD Properties' convenience store and vehicle repair facility was not to be used as a parking area. Baber also indicated on the permit application that he did not anticipate keeping inoperable vehicles on the property. Also, as required on the application form, Baber agreed that MAD Properties' "use [would] comply with the Administrative Permit Standards of the Augusta County Zoning Ordinance."

Baber subsequently met with Administrator Bunch to discuss MAD Properties' application and site plan. From this meeting, Administrator Bunch noted that the purpose for the site plan was to ensure sufficient parking for the property's various uses. On May 8, 2017, the County approved the administrative permit, specifically indicating that there could be "no outside storage of inoperable vehicles." The approved administrative permit also required that all vehicles displayed for sale were to be kept in the designated parking areas shown on the approved site plan.

In 2021, after a number of citizen complaints, the County sent MAD Properties a notice of zoning violation on three separate occasions, "regarding the storage of wrecked or inoperable/unlicensed vehicles" it had discovered in inspecting the property.[4] These notices were mailed to MAD Properties on January 27, 2021, March 18, 2021, and April 7, 2021. Baber timely appealed the County's April 7, 2021 notice of zoning violation on May 7, 2021.[5] Following a hearing, the Augusta County Board of Zoning Appeals ("BZA") upheld Administrator Bunch's determination that the property was in violation of the County's Zoning Ordinance on July 1, 2021. The BZA decision was not appealed to the circuit court.

---

[4] Prior to these notices, an inspection following an October 29, 2020 complaint did not find any violations. In this timeframe, the County had also issued a separate notice of violation to Baber regarding earthwork that had been done on a floodplain located at the property.

[5] It is unclear from the record before the Court whether Baber's appeal raised concerns with all of the outstanding notices or whether it concerned solely the April 7, 2021 notice.

Following the BZA decision, Administrator Bunch "continue[d] to receive complaints regarding wrecked/inoperable or unlicensed vehicles brought to the property and stored in public view behind the building or on the back of a roll-back." In response, she continued to have the County's zoning inspector, Trey Duke ("Inspector Duke"), examine the property for violations. Most of his inspections confirmed that MAD Properties continued to store inoperable vehicles on the property in violation of the administrative permit. As a result of this continued noncompliance, on December 1, 2021, Administrator Bunch sent a notice of violation letter to MAD Properties "for the open storage of inoperable vehicles and the parking of vehicles in areas other than those designated on a site plan attached to a 2017 administrative permit." The notice of violation letter advised MAD Properties that if they did "not abate this violation and contact our office by the date listed" in the letter, the "matter w[ould] be turned over to the County Attorney to pursue legal action." This violation letter requested that MAD Properties "correct" the violations by December 14, 2021, by first removing any inoperable vehicles from the property as well as either submitting a revised site plan to show additional parking spaces behind the building or by applying for an administrative permit to have a motor vehicle impoundment lot. The letter also notified MAD Properties that it had the right to appeal the County's decision to the BZA for review, and the letter also noted that the "decision shall be final and unappealable if not appealed within [30] days." MAD Properties failed to appeal the December 1, 2021 violation letter to the BZA.

On December 20, 2021, Inspector Duke examined the property for violations again, but this time he did not see any inoperable vehicles openly stored on the property. His inspection log also confirmed this result by specifically stating "INSPECTED AND DID NOT SEE ANY IN-OP VEHICLES/ FINAL."

"[A]fter receiving a[nother] complaint regarding wrecked vehicles and inop[erable] vehicles," Inspector Duke, on March 9, 2022, again "inspected the property and found two . . .

- 4 -

untagged inop[erable] vehicles behind the building not in the designated area for sales." Two weeks later, he conducted a follow-up inspection and "observed four untagged vehicles in the rear of [MAD Properties'] building." Following another inspection a week later, he again "observed four untagged vehicles." He noted in his log that "one from before has been removed and another was added." Administrator Bunch, however, did not issue an additional notice of violation letter to MAD Properties concerning these latest zoning violations.

Instead, on May 19, 2022, the County sought to enjoin MAD Properties from using the property in a manner in violation of the County's Zoning Ordinance. The complaint filed in the circuit court alleged that MAD Properties had violated the Zoning Ordinance by using the property for "outdoor storage of inoperable motor vehicles in public view" and by displaying motor vehicles for sale on the property outside of the area designated in the site plan. MAD Properties filed an answer denying the allegations in the complaint.

On March 10, 2023, the circuit court held a bench trial on the issues raised in the complaint. Inspector Duke testified concerning the continued violations and several photographs of the property illustrating the alleged violations were entered in evidence. He also detailed that he inspected the property on several occasions and provided a "Zoning Complaint Contact Sheet" ("Sheet"), which was entered into evidence, reflecting the dates and times when he had inspected the property and whether and to what extent a zoning violation had been found. The Sheet indicated that initially on December 20, 2021, MAD Properties' use of the property was in compliance. However, on several subsequent dates the Sheet indicated zoning violations concerning inoperable vehicles being found on the property, as well as the misuse of the designated parking spaces on the approved site plan.

Administrator Bunch further testified that no zoning classification in the County's zoning ordinance authorized, as a legal use, the unscreened or unshielded storage of an inoperable vehicle.

She also testified that based on her research, no site plan existed as to the property's vehicle service and retail sales uses as well as any pre-existing uses. Administrator Bunch further testified based on the documentary evidence that she reviewed that MAD Properties' use of the property was in violation of the zoning ordinance. Administrator Bunch also acknowledged that she sent no further notice of violation to MAD Properties after December 20, 2021.

Additional evidence adduced at trial included dated photographs showing operable vehicles parked on the property outside of the parking spaces set forth on the site plan referenced in the administrative permit issued to MAD Properties. Several of the dated photographs reflected inoperable vehicles on the property without license plates or inspection stickers, as well as vehicles loaded on roll-backs.

Following the completion of the County's case in chief, Baber testified that MAD Properties was engaged in a lawful pre-existing use of the property for vehicle service that predated the initial enactment of the County's first zoning ordinance. In support, he provided copies of leases for the property showing its use for vehicle repair as early as 1935 and continuing through at least 1945. Baber also testified that he had access to an impoundment yard and therefore never stored towed vehicles (on or off a tow truck or roll-back) on the property. He further asserted that the only vehicles located on the property were vehicles awaiting repairs. Finally, Baber testified that the use of tow trucks on the property was necessary to facilitate the permitted vehicle service and sales uses. Following the receipt of briefs in lieu of closing argument, the circuit court took the matter under advisement.

On April 24, 2023, the circuit court issued a letter opinion[6] holding that MAD Properties had violated the zoning ordinance and granting the County its requested injunctive relief. The letter

_____

[6] This opinion was incorporated by reference into the final order.

opinion further ordered MAD Properties to abate the zoning violations and permitted the County to enter the property to abate the violations if MAD Properties failed to comply with the opinion.

As a basis for its holding, the circuit court found that the County initiated the complaint after MAD Properties failed to respond to the December 1, 2021 violation letter. The circuit court also found that further inspections after December 1, 2021, confirmed that the property remained in violation of the Zoning Ordinance. The circuit court then noted that "inoperable vehicles" were distinct from vehicles "awaiting repair," finding that "although there can be overlap," an "'inoperable motor vehicle' is a defined term within the Zoning Ordinance and is thus distinguishable from a vehicle that simply needs to be repaired." The circuit court further found that the County's photographic evidence of vehicles on the property met the definition of "inoperable vehicles" because they showed several vehicles on the parcel that lacked valid license tags and valid inspection decals, as well as a partially wrecked vehicle that also lacked a valid license tag and inspection decal. Hence, the circuit court concluded that given this presence of "inoperable vehicles" on the property, MAD Properties had violated the ordinance by storing the inoperable vehicles openly on the property.

In addition, citing the thing-decided doctrine, the circuit court refused to consider MAD Properties' affirmative defenses involving an alleged grandfathered use of the property and vested rights in the alleged nonconforming use based on the existence of the uses before the adoption of a zoning ordinance. Instead, the circuit court adopted the County's contention that MAD Properties was "barred from claiming that they were not in violation, for example by presenting a defense based on an argument that one or more uses on the subject property are 'grandfathered' or that they have a vested right in a nonconforming use." The circuit court opined that "given the fact that [MAD Properties] did not appeal the previous notice of violation, it [was] established that [MAD Properties was] in violation of the relevant sections in the Zoning Ordinance" at the time this matter

came before the court. The circuit court found the thing-decided doctrine applicable due to two facts contained within the December 2021 violation letter: 1) the letter cited inoperable vehicles openly stored behind the building and the presence of tow trucks in public view and 2) it also cited a violation of the administrative permit to the extent that any of the vehicles behind the building were being displayed for sale. Relying on *County of Chesterfield v. Lane*, 104 Va. Cir. 1, 2 (Chesterfield 2019), the circuit court reasoned that because "[t]he County proved that a notice of violation, which included notice of the right to appeal, had been issued but that no appeal had been pursued" in the past that it "had met the 'threshold requirements of the thing-decided doctrine'" per what had been described in *Lane*. Applying the thing-decided doctrine, the circuit court found that the County could affirmatively seek relief and bar MAD Properties from raising affirmative defenses pertaining to future violations of the zoning ordinance since MAD Properties had not exhausted its administrative remedies regarding a previous violation.

Finally, by final order dated July 10, 2023, the circuit court directed MAD Properties to immediately abate the violations and authorized County representatives to enter the property to abate the violations if MAD Properties failed to do so, at MAD Properties' expense. MAD Properties appealed.

## II. ANALYSIS

### A. *Standard of Review*

"We review questions of statutory interpretation de novo." *Calway v. City of Chesapeake*, 79 Va. App. 220, 225 (2023). We also review de novo "[a] circuit court's interpretation of a statute or ordinance and its application of that statute or ordinance to the facts of a case." *Prince William Bd. of Cnty. Supervisors v. Archie*, 296 Va. 1, 9 (2018). And we review "[w]hether preclusion is applicable" as a "question of law to [also] be reviewed de novo." *Chilton-Belloni v. Angle ex rel. City of Staunton*, 294 Va. 328, 335 (2017). But where the appeal

presents a mixed question of law and fact, "[w]e must afford deference to the trial court's factual findings." *Ferguson v. Stokes*, 287 Va. 446, 450 (2014).

B. *The circuit court erred in applying the thing-decided doctrine to bar MAD Properties from presenting evidence of affirmative defenses.*

To resolve this appeal, we must interpret the statutory deadline for an aggrieved party to appeal an adverse decision made by a zoning administrator, which, by judicial interpretation, has become known as the thing-decided doctrine. As this doctrine is amorphous, we proceed by examining its metes and bounds before applying that understanding to address the facts before the Court. In doing so, we must first consider the bounds of the doctrine in light of statutory and judicial authority. Then, we must evaluate whether the circuit court's decision here to apply the doctrine falls within such bounds. Hence, as always, we begin our analysis with the text.

1. Applicable rules of statutory interpretation and construction

"In interpreting [a] statute, 'courts apply the plain meaning . . . unless the terms are ambiguous or applying the plain language would lead to an absurd result.'" *Miller & Rhoads Bldg., L.L.C. v. City of Richmond*, 292 Va. 537, 541 (2016) (quoting *Baker v. Commonwealth*, 284 Va. 572, 576 (2012)). "A statute's plain language leads to 'absurd results' when it produces illogical or anomalous results." *Emmanuel Worship Ctr. v. City of Petersburg*, 300 Va. 393, 405 (2022).

"[I]n construing statutes, this Court 'will apply the ordinary meaning of the word "may,"' which is '"permission, importing discretion"' where, as here, no 'contrary legislative intention plainly appears.'" *Bd. of Supervisors of Loudoun Cnty. v. State Corp. Comm'n*, 292 Va. 444, 454 (2016) (quoting *Sauder v. Ferguson*, 289 Va. 449, 457 (2015)). "The word 'may' should not be construed to mean 'must' or 'shall,' unless the clear intention of the legislature demands it." *Spindel v. Jamison*, 199 Va. 954, 957 (1958) (quoting *Harrison v. Wissler*, 98 Va. 597, 599 (1900)). However, we may "construe [the word may] to be mandatory when it is necessary to

accomplish the manifest purpose of the Legislature," *Harper v. Va. Dep't of Taxation*, 250 Va. 184, 194 (1995) (quoting *Caputo v. Holt*, 217 Va. 302, 305 n.\* (1976)), or if the statutory "subject matter and context" justifies such interpretation, *Cirrito v. Cirrito*, 44 Va. App. 287, 309 (2004) (quoting *Tm Delmarva Power v. NCP of Va. L.L.C.*, 263 Va. 116, 121 (2002)).

In addition, "[l]ike Congress, the General Assembly does not generally 'hide elephants in mouse holes.'" *NAACP (Hanover Cnty. Chapter) v. Commonwealth ex rel. Va. State Water Control Bd.*, 74 Va. App. 702, 715 (2022) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)). Likewise, we also "cannot by construction supply a *casus omissus* by giving force and effect to the language of the statute when applied to a subject about which nothing whatever is said, and which to all appearances was not in the minds of the legislature at the time of the enactment of the law." *Chandler v. Peninsula Light & Power Co.*, 152 Va. 903, 908 (1929) (quoting 25 Ruling Case Law § 225, at 974 (1919)). Thus, "though [w]e do not question the power of the legislature to grant to towns [and other municipalities] police powers" we may determine whether the General Assembly has "done so by the act under consideration" and if it has not "[t]here may be good reasons why it should have done so, and no good reasons why it should not have done so" that preclude us from "supply[ing] the omission." *Jordan v. Town of South Boston*, 138 Va. 838, 843 (1924).

2. The development of the thing-decided doctrine

The thing-decided doctrine is derived from Code § 15.2-2311(A), which states in part that "[a]n appeal to the [BZA] may be taken by any person aggrieved . . . by any decision of the zoning administrator." To be timely, this appeal must occur "within 30 days." *Id.* And the "decision shall be final and unappealable if not appealed within [that time]." *Id.*

From this text, the Supreme Court of Virginia in *Gayton Triangle Land Company v. Board of Supervisors of Henrico County*, 216 Va. 764, 766 (1976), held that if "a landowner

claims the zoning ordinance is invalid as applied to his specific property, he must exhaust adequate and available administrative remedies before . . . mak[ing] a direct judicial attack on . . . the ordinance." From this precedent, the Supreme Court eventually held that this exhaustion requirement, satisfied by an appeal of the zoning administrator's determination, is "mandatory," *Lilly v. Caroline Cnty.*, 259 Va. 291, 296 (2000), and must be satisfied before "a landowner['s] . . . elect[ion] to seek an administrative determination," *Bragg Hill Corp. v. City of Fredericksburg*, 297 Va. 566, 582-83 (2019) (quoting *Lilly*, 259 Va. at 296).

Hence, under the thing-decided doctrine, if the landowner seeks an administrative determination pertaining to the zoning administrator's decision without first appealing this decision, "the administrative remedy has not been exhausted and the zoning administrator's decision becomes a 'thing-decided' not subject to court challenge." *Id.* at 583. Thus, under this doctrine, the landowner must appeal "the various decisions in which he was declared in violation of the zoning ordinance" to the Board of Zoning Appeals to preserve future judicial review. *Gwinn v. Alward*, 235 Va. 616, 621 (1988).

In application, the thing-decided doctrine is generally invoked to bar landowners from collaterally attacking the validity of a zoning ordinance or a zoning administrator's decision where they failed to appeal a notice of violation or otherwise comply with the regulatory process. *Lilly*, 259 Va. at 296 (holding that a plaintiff landowner's failure to timely appeal the underlying zoning administrator's decision to the BZA triggered the thing-decided doctrine's application); *Alward*, 235 Va. at 621 (barring plaintiff landowner from contesting a county's decision to deny his application for a trash hauling permit where he failed to appeal the decision or raise a lawful nonconforming use as an affirmative defense).[7] The thing-decided doctrine's preclusive effect

---

[7] This bar is conceptually grounded in justiciability considerations. *Dail v. York Cnty.*, 259 Va. 577, 582 (2000) ("The requirement that a landowner must exhaust his administrative

has also been found to apply in cases where the landowner fails to "correct . . . violations" and continues the violative use under the authority of an erroneously issued permit. *Gwinn v. Collier*, 247 Va. 479, 481, 483 (1994) (finding that plaintiff landowner was barred from challenging several notices of violations issued by a zoning administrator where he failed to appeal any of the notices or correct any of the noticed violations before the complaint). It has also applied to a landowner's attempt to "seek a vested rights determination" from the circuit court after applying for the same determination "from a zoning administrator" and appealing the determination to the BZA but failing to appeal that determination from the BZA to the circuit court. *Bragg Hill*, 297 Va. at 583-84 (reasoning that to allow the defendant to do so "would defeat the purpose of the administrative determination . . . because any final decision of a zoning administrator, affirmed by the BZA, would be eternally subject to collateral attack in a future circuit court proceeding"). And this doctrine has been applied offensively, keeping defendants from raising affirmative defenses to oppose a county's attempt to seek injunctive relief in the circuit court. *See, e.g.*, *Dick Kelly Enters. Va. P'ship, No. 11 v. City of Norfolk*, 243 Va. 373, 381 (1992).

For instance, in *Dick Kelly*, a city sought to enjoin the defendant landowner from using a building, zoned for use as a motel, for long term apartment living. *See id.* at 375. The city's zoning administrator had notified the landowner by letter of "certain 'zoning and building code violations at the subject property,'" ordering it to "immediately and permanently cease and desist from [the violating use]." *Id.* at 375-76. The letter concluded with a request that the landowner respond to the letter within two weeks. *See id.* at 376. But the landowner did not respond within two weeks and did not appeal this decision to the BZA. *See id.*

remedies before filing a declaratory judgment action is based on the principle that courts do not address issues based on circumstances *which may never materialize*." (emphasis added)).

- 12 -

Instead, the landowner refused to comply with the zoning administrator's letter, declining to correct the violations and leading the city to file suit. *See id.* In responding to the complaint, the landowner raised several "affirmative defenses," including that it had a vested right to a nonconforming use of the property. *Id.* But the circuit court disagreed with the landowner and granted summary judgment to the city. *See id.* at 377.

The Supreme Court of Virginia affirmed the circuit court's judgment, dismissing the landowner's arguments and finding "the landowner's use of the subject property was unlawful from the moment of occupancy and remains so" as a "thing-decided." *Id.* at 379. The Court reasoned that because "[t]he landowner elected to ignore the required procedure and to make this direct judicial attack when confronted with an enforcement action," the landowner could not contest whether its use had been lawful. *Id.* Hence, its failure to appeal the zoning administrator's decision to the BZA formed an "insurmountable hurdle of an unlawful use as 'a thing-decided' not open to attack." *Id.*

Continuing to analyze the landowner's assertions, the Court then found that the landowner's affirmative defenses were likewise unavailing. *See id.* at 379-81. In analyzing the landowner's vested rights argument, the Court noted that "[t]he vested rights theory is bottomed on a claim that the landowner has established a valid nonconforming use at the subject property." *Id.* at 381. "But to establish such a use, it *must be a lawful use existing on the effective date of the ordinance* and continuing since that time not in conformance with the ordinance." *Id.* (emphasis added). Thus, as the landowner's "use in violation of the certificate of occupancy was unlawful from its inception," the Court found that the vested rights defense could not have applied to the landowner's case as it had no pre-existing lawful use. *Id.*

Since *Dick Kelly*, only circuit courts have considered whether or not a defendant's failure to appeal a zoning violation letter to the BZA bars it from raising affirmative defenses to a

county's enforcement action, with conflicting rationales and results.[8]  From *Dick Kelly*, we are able to glean the following rule of law: that when a landowner's use of the subject property violates the county's ordinance from "the moment of occupancy" and the landowner fails to appeal the notice of violations or correct the violative conditions subject to the notice on the property, the "thing-decided" doctrine may be used offensively to bar the landowner from presenting affirmative defenses to oppose the county's request for injunctive relief.  243 Va. at 379.  However, this precedent fails to provide a per se "insurmountable hurdle" in all cases, as the *Dick Kelly* Court appears to have assumed in its ruling that affirmative defenses are not precluded as such by the thing-decided doctrine.  *See id.* at 379-81.

Here, the County was permitted to invoke the thing-decided doctrine offensively in support of its request for injunctive relief.  However, because the defendant's use of the subject property in *Dick Kelly* was "unlawful from the moment of occupancy and remain[ed] so," and no evidence of subsequent corrections or prior compliant uses of the property in that case were in the record, we find its application to this case unclear.  *Id.* at 379.  Thus, to determine the exact mechanics of how the thing-decided doctrine applies offensively, we return to the foundations of the exhaustion and finality principles for guidance.

---

[8] Circuit courts are split on whether a defendant's failure to appeal a zoning violation letter to the BZA bars it from raising affirmative defenses to a county's enforcement action. *Compare Lane*, 104 Va. Cir. at 4 (noting that "once the threshold requirements of the 'thing-decided' doctrine are subsequently met," then the defendant is barred from raising affirmative defenses in a subsequent enforcement action), *and McLane v. Clark*, No. CL 2010-346, 2010 Va. Cir. LEXIS 66, at *9 (Fairfax June 14, 2010) (noting that a landowner was not permitted to introduce evidence of subsequent corrections to oppose the doctrine's application as the county showed that a previous violation had occurred and that the landowner did not appeal it), *with Johnson v. Morgan*, 106 Va. Cir. 126, 130 (Fairfax 2020) (noting that even though the defendant landowners failed to appeal a notice of violation to the BZA, they were still permitted to introduce evidence of subsequent corrections as an affirmative defense).  Before *Dick Kelly*, two circuit court cases also found that the thing-decided doctrine barred landowners from introducing evidence of lawful pre-existing nonconforming uses.  *See Bd. of Supervisors of Fairfax Cnty. v. Martin*, 23 Va. Cir. 37, 39 (Fairfax 1990); *Bd. of Supervisors of Fairfax Cnty. v. Rossi*, No. 110349 (Fairfax Cnty. Cir. Ct. 1989).

### 3. The fundamentals of the exhaustion of administrative remedies and finality doctrines

Foremost, the thing-decided doctrine in function largely operates as an administrative remedy "exhaustion" doctrine. *Bd. of Supervisors of Henrico Cnty. v. Market Inns, Inc.*, 228 Va. 82, 87 (1984). "'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency *alone*; judicial interference is withheld until the administrative process has run its course."[9] *Country Vintner, Inc. v. Louis Latour, Inc.*, 272 Va. 402, 415 (2006) (emphasis added). Where the legislative body "has not clearly required exhaustion, sound judicial discretion governs" its application. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded by statute on other grounds*. But we "do not . . . have free rein to impose [this doctrine], as a matter of policy," through statutory interpretation. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Instead, in interpreting the statute, "the question is not whether administrative [exhaustion] is wise *but whether it is intended by the legislature*." *Id.* (emphasis added). But though there are similarities, as defined by the Supreme Court of Virginia, the thing-decided doctrine does not operate entirely as an exhaustion doctrine.

The thing-decided doctrine also has similar hallmarks to the doctrine of collateral estoppel. "Collateral estoppel . . . prevents the same parties from '[re]litigating in a subsequent suit any issue of fact actually litigated and essential to a valid and final personal judgment in the first action.'" *Plofchan v. Plofchan*, 299 Va. 534, 543 (2021) (quoting *Funny Guy, LLC v. Lecego, LLC*, 293 Va. 135, 142 (2017)). In Virginia, "to successfully assert collateral estoppel,"

---

[9] "It is a 'long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *Fauquier Cnty. Dep't of Soc. Servs. v. Robinson*, 20 Va. App. 142, 152 (1995) (quoting *Philip Morris, Inc. v. Block*, 755 F.2d 368, 369 (4th Cir. 1985)). The logic underpinning the doctrine is that of justiciability, requiring that the party complaining of the impact of a zoning ordinance on his property rights exhaust his administrative remedies before he has standing to challenge the agency's decision or its decision-making authority. *See* 1A Michie's Jurisprudence, *Administrative Law* § 17 (2024).

a party must establish 1) that the two proceedings involved the same parties or their privies, 2) the issue of fact that the party seeks to bar from being relitigated must have been actually litigated in the first proceeding, 3) that issue of fact must have been essential to the prior judgment, and 4) the prior proceeding must have resulted in a valid, final judgment against the party against whom the doctrine is sought to be applied.  *See Plofchan*, 299 Va. at 543-44 (quoting *Lane v. Bayview Loan Servicing, LLC*, 297 Va. 645, 654-55 (2019)).  On their own, the doctrines of administrative exhaustion and res judicata have been noted as "conceptually distinct."[10]  *Darby v. Cisneros*, 509 U.S. 137, 144 (1993).  But in the administrative context, pure res judicata has been found to be difficult to impose due to the quirks of administrative proceedings, *see Va. Imports, Ltd. v. Kirin Brewery of Am., LLC*, 50 Va. App. 395, 410 (2007), resulting in the development of the "administrative preclusion" doctrine,[11] *Astoria*, 501 U.S. at 109.

---

[10]

> The finality requirement [of res judicata] is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

*Darby v. Cisneros*, 509 U.S. 137, 144 (1993) (quoting *Williamson Cnty. Reg'l Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U.S. 172, 193 (1985), *overruled in part by Knick v. Twp. of Scott*, 588 U.S. 180, 206 (2019)).

[11] At common law, principles contained within res judicata applied only to a decision made by a "court of competent jurisdiction."  *Aurora City v. West*, 74 U.S. 82, 102 (1869); *Corprew v. Corprew*, 84 Va. 599, 602 (1888) ("It is undoubtedly settled law that a judgment of a court of competent jurisdiction upon a question directly involved in one suit, is conclusive as to that question, in another suit between the same parties." (quoting *Withers' Adm'r v. Sims*, 80 Va. 651, 658 (1885))).  That rule came with the corollary requirement that the court be "legally constituted"—that is, a court "known to and recognized by the law."  2 Henry Campbell Black, *A Treatise on the Law of Judgments Including the Doctrine of Res Judicata* § 516, 614 (1st ed. 1891)).  A court not "legally constituted" lacked jurisdiction to enter a legally binding judgment,

Under administrative preclusion, "[w]hen an administrative agency [or tribunal] [acts] in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," we apply res judicata to "to enforce repose." *CDM Enters., Inc. v. Commonwealth*, 32 Va. App. 702, 712 (2000) (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966), *superseded by statute on other grounds*). This preclusive effect is available for "[o]nly what is adjudicated." *Appalachian Power Co. v. John Stewart Walker, Inc.*, 214 Va. 524, 534 (1974) (quoting 2 Kenneth Culp Davis, *Administrative Law Treatise* § 18.08, at 597 (1958)). Where the adjudicatory element is satisfied, the preclusive effect of the agency's decision depends on "if the ordinary elements of issue preclusion are met." *B&B Hardware, Inc. v. Hargis Indus.*, 575 U.S. 138, 151 (2015).

However, the Supreme Court of Virginia has recently warned of the dangers in applying res judicata principles to zoning decisions in the context of BZA appeals, as such may not in all cases be "truly adjudicative." *Chilton-Belloni*, 294 Va. at 337. In *Chilton-Belloni*, the Supreme Court held that the claim preclusion principles of res judicata did not bar reconsideration of a variance application, finding "its application in the realm of zoning appeals for this variance request to be improper." *Id.* It reasoned that such an application was inappropriate because "a strict rule of res judicata in zoning matters could have unfortunate consequences such as denying a landowner once refused relief the right to a reconsideration of an application based upon intervening circumstances resulting in a deprivation of all beneficial use of his property." *Id.* (quoting *Marks v. Zoning Bd. of Review*, 203 A.2d 761, 763 (R.I. 1964)). It further noted that the

---

and thus any such judgment could have no preclusive effect. *Id.* However, administrative agencies were not considered to be such. *Pearson v. Williams*, 202 U.S. 281, 285 (1906) (noting that agencies' decisions "long ha[d] been recognized as decisions of the executive department, and cannot constitute res judicata in a technical sense"). Because of this requirement, pure res judicata was largely inapplicable to decisions of administrative agencies that did not involve adjudication. *Appalachian Power Co. v. John Stewart Walker, Inc.*, 214 Va. 524, 534 (1974).

"[u]se of a property should not be forever governed and restricted by the date at which an owner first seeks permission to alter the property. It should be allowed to evolve along with the zoning standards of the locality." *Id.* "[A]s a result, in the case of administration of local zoning ordinances and exceptions thereto, the interests in finality and judicial economy may at times give way to the interest in treating various landowners fairly and equally at a given time," and the Supreme Court saw "no reason that either claim or issue preclusion would be required to apply" to such decisions.[12] *Id.* at 340. Thus, in the wake of *Chilton-Belloni*, we must acknowledge this policy consideration pertaining to zoning, which cautions against a strict application of administrative preclusion here.

> 4. The circuit court erred in interpreting the thing-decided doctrine as barring MAD Properties from presenting its affirmative defenses and erred in applying it in this case, as the record reflects that the "issues" raised in the notices of violation had been remedied prior to the County's complaint.

In this case, the circuit court reasoned that the thing-decided doctrine barred consideration of MAD Properties' affirmative defenses. The circuit court also found that MAD Properties was in violation of the Zoning Ordinance as alleged in the County's complaint as well as in the December 1, 2021 notice of violation. In doing so, the circuit court expressly relied on two prior circuit court cases, *Lane*, 104 Va. Cir. 1, and *Board of Supervisors of Fairfax County v. Martin*, 23 Va. Cir. 37 (Fairfax 1990), in determining that the thing-decided doctrine stands for two propositions: 1) that if the County proves that the landowner failed to appeal *one* notice of violation, then the County has "met the 'threshold requirements of the thing-decided doctrine,'" *Lane*, 104 Va. Cir. at 2, and 2) that if the County succeeds in meeting the threshold requirements for the thing-decided doctrine, then the landowner is "barred from claiming that they are not in

---

[12] *Chilton-Belloni* involved a variance decision under Code § 15.2-2309, but the portion of the opinion we rely upon here discusses the consequences of failing to appeal a BZA decision generally.

- 18 -

violation of the Zoning Ordinance" by introducing evidence of affirmative defenses.[13] In opposition, MAD Properties contends that this interpretation by the circuit court was in error as this doctrine is "narrower" than the circuit court's application, which it contends does not serve to bar it from presenting affirmative defenses to the County's allegations. Additionally, MAD Properties contends that the doctrine is inapplicable here since "the facts underlying the zoning administrator's direct enforcement and the County's litigation are different and the factual findings underlying the former do not support the relief sought in the latter." We agree with MAD Properties.

We begin by noting that the thing-decided doctrine is a type of administrative preclusion doctrine, subject to the text of Code § 15.2-2311(A), which prescribes the following procedural mechanics. First, the landowner is entitled to "appeal to the board . . . any decision of the zoning administrator," provided such appeal occurs "within 30 days." Code § 15.2-2311(A). If the landowner fails to do so, the decision becomes "final and unappealable." *Id.* But a timely and successful appeal is not the only way to avoid penalties for failure to comply with the zoning administrator's decision. The landowner may instead correct the violation, whether by abating the violative conditions or by obtaining a permit that would allow the use in question. *See, e.g.*, *Collier*, 247 Va. at 483. Hence, Code § 15.2-2311(A) permits the landowner to raise affirmative defenses to the offensive use of the thing-decided doctrine, including that of a subsequent correction. Thus, the circuit court erred by barring consideration of MAD Properties' evidence that it had abated the violation.

---

[13] For example, the circuit court found that because MAD Properties failed to appeal *one* of its previous notices of violation pertaining to inoperable vehicles being on the property, this doctrine bars it from presenting "grandfathered" use or "vested right in a nonconforming use" defenses. *Martin*, 23 Va. Cir. at 39.

Moreover, we also find that by precluding MAD Properties from putting on evidence that it had a pre-existing lawful nonconforming use of the property, the circuit court extends the Supreme Court of Virginia's precedent in *Dick Kelly* too far. In *Dick Kelly*, the Supreme Court of Virginia found that a landowner was barred from asserting a pre-existing nonconforming use as an affirmative defense where the landowner *continuously* used the property in question from the time it occupied it in a manner that violated a county ordinance. *See* 243 Va. at 379-81. There, the landowner introduced no evidence that it had corrected the violations, nor did the landowner show, in the alternative, that it had received a subsequent permit to rectify its non-compliance. *See id.* Thus, the offensive use of the thing-decided doctrine, in light of *Dick Kelly*, is limited and does not encompass the factual scenario present here.

*Dick Kelly*'s purview is limited to scenarios where the landowner either fails to assert a pre-existing use of the property in question, fails to appeal the government's notices of violation, or fails to assert abatement of the alleged violations. *See id.* In *Dick Kelly*, the violative condition cited in each notice of violation—the operation of apartments at a building zoned for use as a hotel—remained the same. *Id.* at 379-81. Here, by contrast, because the nature and the number of violative conditions changed between each inspection, the condition of the property was continually in flux, and the issues cited in each notice of violation were in fact different, there is too much variation to support the circuit court's use of the thing-decided doctrine.

Moreover, there is also no evidence in the record reflecting that MAD Properties previously sought an "administrative determination" of its putative vested right in a nonconforming use; thus, there were no grounds that supported barring MAD Properties from raising this affirmative defense. *Bragg Hill*, 297 Va. at 582. Since MAD Properties could plausibly assert that since 1935 it and its predecessors had been using the property for vehicle repair (which it asserts involves the storage of currently inoperable vehicles on the property),

- 20 -

under applicable precedent, MAD Properties should have been permitted to raise this affirmative defense for the circuit court to evaluate in the context of the enforcement action against it, and the circuit court's refusal is further error.[14]

Although this doctrine is judicially administered, we decline to adopt the circuit court's interpretation barring these affirmative defenses below since it would expand the thing-decided doctrine beyond what is "*intended by the legislature*." *Astoria*, 501 U.S. at 108 (emphasis added). First, there is no textual hook contained in Code § 15.2-2311(A) that provides for such expansive authority as the only term in the provision that provides for the power of the doctrine's offensive use is the term "may." To interpret this "may" to preclude a landowner from presenting any affirmative defenses when the government seeks to use the doctrine offensively would essentially require it to be interpreted to mean "must" in all contexts, which existing authority has declined to do. *Compare Lilly*, 259 Va. at 296, *with Cirrito*, 44 Va. App. at 309. In light of the Supreme Court's precedent in *Dick Kelly* and *Chilton-Belloni*, any such interpretation would lead to an absurd result. For example, if landowners were not permitted to contend that they brought themselves into compliance with an ordinance, it would extinguish a permissible alternative approach of remedying violations clearly contemplated by the General Assembly's use of "may." Hence, this suggested interpretation would force landowners to file an appeal in *all* cases, even if they prefer to correct the violation instead, all solely to preserve any right they have to contest *future* violations. This "would have unfortunate consequences" such as denying the landowner the opportunity to rectify issues on their property, causing them to incur the cost of meritless appeals, and permitting additional intrusion through granting injunctive relief that is not tied to the current state of the property. *Chilton-Belloni*, 294 Va. at 337 (quoting *Marks*, 203

---

[14] In doing so, the landowner would not be permitted to collaterally attack the past violation, but instead would do so to defend against *prospective* violations.

A.2d at 763). Considering the text and context contemplated by Code § 15.2-2311(A), we find the County's suggested interpretation to be "illogical," *Emmanuel Worship*, 300 Va. at 405, and not "necessary to accomplish the manifest purpose of the Legislature," *Harper*, 250 Va. at 194 (quoting *Caputo*, 217 Va. at 305 n.*).

Moreover, in declining to adopt the circuit court's reasoning, we also caution that expanding the thing-decided doctrine as suggested would provide the government administering an ordinance immense regulatory and judicial power by inference. Importantly, the inference would stem from statutory text that not only makes no mention of such prospective power, but instead serves to vest the aggrieved *landowner* with some discretion in how they are able to deal with such violations.[15] Code § 15.2-2311(A). Reading "may" in such a way is thus beyond the pale, as it neglects the principle that the "General Assembly does not . . . 'hide elephants in mouse holes.'" *NAACP*, 74 Va. App. at 715 (quoting *Whitman*, 531 U.S. at 468). As the preclusive power alluded to in the circuit court's reasoning would be *even* greater than the preclusive power arising in cases involving typical res judicata, adopting the circuit court's reasoning would imply the proverbial elephant into the mouse hole created here simply by the General Assembly's use of the word "may." *Id.*; Code § 15.2-2311(A). This would be the case as this interpretation would permit the government to preclude a landowner from contesting a *current violation* of a zoning ordinance on the basis that a *previous and potentially unrelated* violation occurred and was not appealed. Also, this interpretation likewise runs afoul of the omitted case "*casus omissus*" doctrine, *Jordan*, 138 Va. at 843, as it would "giv[e] force and effect to the language of the statute . . . applied to a subject about which nothing whatever is

---

[15] This provision also vests the right to an appeal in "any officer, department, board or bureau of the locality affected by any decision of the zoning administrator or from any order, requirement, decision or determination made by any other administrative officer in the administration or enforcement of this article." Code § 15.2-2311(A).

said," that being the offensive preclusive effect of the thing-decided doctrine, *Chandler*, 152 Va. at 908. Thus, there are ample canons of statutory construction that would lecture against the circuit court's reading of Code § 15.2-2311, in addition to the authority provided by *Dick Kelly* and *Chilton-Belloni*.

Simply put, if the General Assembly wished to preclude landowners from raising affirmative defenses at trial to contest the decisions of zoning administrators where the landowner failed to administratively appeal those decisions, it would have done so explicitly, and this it may simply do in the future. *Dick Kelly* permits landowners to raise these affirmative defenses. 243 Va. at 379-81. And we find no grounds to distinguish that case's authority from the text of Code § 15.2-2311(A).[16] Thus, we conclude that the circuit court erred as a matter of law by precluding MAD Properties' affirmative defenses of correction and grandfathering as a pre-existing nonconforming use.

As a consequence, we reverse the circuit court's judgment and remand this matter to the circuit court for further proceedings consistent with this opinion.[17] Thus, on remand, the circuit court is tasked with evaluating the affirmative defenses raised by MAD Properties as well as the alleged zoning violations in determining whether injunctive relief is merited.[18] However, since

---

[16] Consistent with this holding and as a matter of jurisprudential clarity, we note that circuit court decisions to the contrary are overruled. *Lane*, 104 Va. Cir. 1; *McLane*, No. CL 2010-346, 2010 Va. Cir. LEXIS 66; *Martin*, 23 Va. Cir. 37; *Rossi*, No. 110349.

[17] No part of our decision in any way diminishes the probative value of the previous violations documented by the County. These previous violations are probative evidence for the circuit court to consider in deciding whether or not an injunction should issue, as divorced from the consideration of whether they justify applying the thing-decided doctrine.

[18] Thus, we decline to address MAD Properties' sufficiency of the evidence assignment of error as this determination will be made de novo on remand. *See, e.g.*, *Nassif v. Bd. of Supervisors of Fairfax Cnty.*, 231 Va. 472, 480-81 (1986) ("When this Court rules that the judgment of a trial court is erroneous . . . it is no longer viable. Unless we say otherwise, the slate is wiped clean, with the result that on remand the parties begin anew.").

the issues raised by MAD Properties concerning the Zoning Ordinance and its interpretation "will likely arise on remand," *Toraish v. Lee*, 293 Va. 262, 272 n.3 (2017), we must address those issues on appeal.

C. *The circuit court's interpretation of the Zoning Ordinance is fair and reasonable.*

MAD Properties also contends, based on several canons of both statutory interpretation and construction, that the circuit court erred in interpreting the applicable sections of the Augusta County Zoning Ordinance. It asserts that the circuit court's interpretation of the site map and the term "inoperable vehicles" would lead to an "absurd result" and proscribe an otherwise lawful use since the interpretation fails to recognize that its use of the parking spaces and roll-back vehicles located on the property are incident and necessary to the uses allowed pursuant to the administrative permit. We agree in part and disagree in part with MAD Properties.

"In interpreting an ordinance, we apply the same rules of construction applicable to statutes." *Herrington v. City of Va. Beach*, 71 Va. App. 656, 661 (2020). "When reviewing the interpretation of a zoning ordinance, the 'words of the ordinance are to be given their plain and natural meaning,' and the 'purpose and intent of the ordinance should be considered but the ordinance should not be extended by interpretation or construction beyond its intended purpose.'" *Archie*, 296 Va. at 9 (quoting *Donovan v. Board of Zoning Appeals of Rockingham Cnty.*, 251 Va. 271, 274 (1996)). And "'we will not read a[n] [ordinance] in a manner that renders any portion of that enactment useless[,]' but rather, we faithfully apply the ordinance 'by giving reasonable effect to every word used.'" *Herrington*, 71 Va. App. at 661 (third alteration in original) (quoting *Antisdel v. Ashby*, 279 Va. 42, 48 (2010)). Thus, we are to "give . . . [zoning ordinances] a fair and reasonable construction in the light of the manifest intent of the legislative body enacting them." *Patton v. City of Galax*, 269 Va. 219, 229 (2005) (quoting *Mooreland v. Young*, 197 Va. 771, 775 (1956)).

"[A]n undefined term must be given its ordinary meaning, given the context in which it is used." *Taylor v. Commonwealth*, 298 Va. 336, 342 (2020) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 237 (2013)). "In ascertaining such meaning, dictionary definitions and pertinent analysis in prior case law may be consulted." *Eley v. Commonwealth*, 70 Va. App. 158, 165 (2019). Further, the Supreme Court of Virginia has found that "'[a]ny' is defined, in part, as 'one or some *indiscriminately* of *whatever kind*'; 'one or more indiscriminately from all those of a kind'; or 'one that is selected *without restriction or limitation of choice*.'" *Botkin v. Commonwealth*, 296 Va. 309, 314-15 (2018) (quoting *Any*, *Webster's Third New International Dictionary* (2002)).

Similarly, "'[i]n interpreting [ordinance] language, we . . . appl[y] the time-honored principle *expressio unius est exclusio alterius*,' because this maxim 'recognizes the competence of the legislature to choose its words with care.'" *Miller & Rhoads*, 292 Va. at 543-44 (quoting *Va. Dep't of Health v. NRV Real Estate, LLC*, 278 Va. 181, 187-88 (2009)). This principle also applies when "a [written instrument] covers particular or express matters." *Yukon Pocahontas Coal Co. v. Ratliff*, 181 Va. 195, 203 (1943) (quoting 16 Am. Jur., *Deeds* § 232 at 537). "Under this maxim, '[w]hen a legislative enactment limits the manner in which something may be done, the enactment also evinces the intent that it shall not be done another way.'" *Id.* (quoting *Grigg v. Commonwealth*, 224 Va. 356, 364 (1982)). But "the canon *expressio unius est exclusio alterius* . . . has force only when the items expressed are members of an 'associated group or series.'" *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting *United States* v. *Vonn*, 535 U.S. 55, 65 (2002)).

Augusta County's Zoning Ordinance "specifically prohibit[s]" all uses of property in an area zoned for general business that are not expressly authorized as a permitted use. Augusta County Ordinance § 25-305. This ordinance further identifies principal and accessory uses

permitted by right, uses that are permitted upon issuance of an administrative permit, and uses that are permitted upon the issuance of a special use permit. *See, e.g.*, Augusta County Ordinance §§ 25-302 (providing by-right uses); 25-303 (providing administrative permit uses); 25-304 (providing special use permit uses).

By right, a landowner whose property is zoned for general business use can utilize the property for "Vehicle Service" purposes among other things. Augusta County Ordinance § 25-302(T). Pursuant to the "Vehicle Service" use, "[v]ehicles awaiting repair for more than thirty (30) days must meet the requirements for Limited Outdoor Storage pursuant to the requirements in § 25-303(K) or obtain a Special Use Permit for General Outdoor Storage pursuant to the requirements of § 25-304(B)." *Id.* The ordinance does not define "vehicles awaiting repair."

Furthermore, in an area zoned for general business use, Augusta County defines the term "[a]dministrative [p]ermit" to be "[w]ritten governmental permission issued by an authorized official, empowering the holder thereof to do some act not forbidden by law but not allowed without such authorization." Augusta County Ordinance § 25-4. One such use that is permissible is for "Vehicle Sales Lots." Augusta County Ordinance § 25-303(I).

"Vehicle Sales Lots, include[s] the keeping of any motor vehicles . . . for sale or lease and in operable condition." *Id.* This provision does not "include vehicles incapable of passing a Virginia state inspection in their current condition," unless the landowner obtains an "Administrative Permit" and "provide[s] an adequate site plan [that is] approved [by the County]." *Id.* This site plan requires the landowner to "show" the County that the property would conform to certain conditions such as "clearly delineating" vehicle display areas, "[c]ustomer parking areas," and "[i]f the keeping of inoperable motor vehicles or equipment is anticipated, a vehicle impoundment yard" on the site plan. Augusta County Ordinance

§ 25-303(I)(2)-(4).[19]  The ordinance defines an "inoperable" motor vehicle in pertinent part as "[a]ny motor vehicle, . . . which meets any of the following:

> 1. Does not have valid license plates and valid inspection decals, unless exempt by Augusta County or state law[;]
>
> 2. Is not in operating condition[;] or
>
> 3. Has been partially or totally wrecked, or partially or totally disassembled by the removal of tires and wheels, the engine, or other essential parts required for operation of the vehicle for a period of sixty (60) days or longer.

Augusta County Ordinance § 25-4.

Likewise, the requirements for "Limited Outdoor Storage" under Augusta County Ordinance § 25-303(K) also provide that the landowner is required to obtain an administrative permit and maintain the property in certain ways, including creating an impoundment area and requiring "[v]ehicles . . . awaiting repair for more than thirty (30) days [to be] . . . within [a] vehicle impoundment area."

In addition to these permitted uses by right or by administrative permit, a separate ordinance provides that landowners of properties within the General Business Zoning Classification may have several by-right *accessory* uses to their property.  *See* Augusta County Ordinance § 25-56.  Per Augusta County Ordinance § 25-58, a landowner may operate a "[m]otor vehicle impoundment lot . . . , when accessory to a motor vehicle storage, sales, repair or towing business, when permitted by Administrative Permit."  But this use imposes requirements on the landowner including that:

> 2. Storage of vehicles shall be limited to areas shown on an approved site plan.
>
>    . . . .
>
> 5. All vehicles, . . . awaiting repair for more than thirty (30) days must be located within the required screened vehicle impoundment lot.

---

[19] The requirements from this ordinance were clearly listed on the administrative permit application form completed by Baber.

6. No vehicle placed in an impoundment lot shall be permitted to remain there longer than 120 days.

*Id.*

MAD Properties contends, on appeal, that the circuit court erred in its interpretation of the County's Zoning Ordinance by 1) finding that its use of the property for parking vehicles behind the building on the property incident to its pre-existing vehicle service and retail sales business violated the ordinance after it received an administrative permit in 2017; and 2) agreeing with the County that the definition of "inoperable motor vehicles" in Augusta County Ordinance § 25-4 differs from "vehicles awaiting repair" and that it included vehicles in tow or on roll-back carriers that were otherwise operable. We take each in turn.

1. To the extent the vehicle is operable, the administrative permit does not restrict parking on the property for vehicle service uses.

MAD Properties contends that the circuit court erred by interpreting the administrative permit to find that it violated the ordinance by using parking spots it had designated on its site map for other "long-existing . . . [uses]." It argues that although the administrative permit specifically regulated MAD Properties' parking of vehicles on the property for retail services (i.e., the convenience store on the property) and for vehicle sales lots, it omitted vehicle service, thus making it inapplicable to that use. We agree with MAD Properties.

When parking is concerned, "[i]t shall be the responsibility of the owner or operator of a specific use to . . . maintain the number and markings of all parking spaces and all directional arrows and signs as shown on the approved site plan at all times." Augusta County Ordinance § 25-31. In applying for the administrative permit to conduct vehicle sales on the property, Baber handwrote on the site plan that this permit was to "ADD[] AUTO SALES USE TO EXISTING." The site plan he submitted marked twelve parking spaces on the property, designating six for customer parking and six for displaying vehicle sales inventory. And this site

- 28 -

plan noted that the area behind MAD Properties' building was not designated for parking. Baber did not note on the site plan that any parking on the property was marked for vehicle service use. Nor did he note that MAD Properties operated any form of impoundment yard on the property. From this omission, MAD Properties asserts that because no parking spots were designated for vehicle services on the property that *any parking space* on the property could be used for vehicle service purposes, designated or non-designated. Augusta County Ordinance § 25-31.

Here, the vehicle service use of the property was a by-right permitted use. Augusta County Ordinance § 25-302(T). The ordinance governing vehicle service uses only requires that "[v]ehicles awaiting repair for more than thirty (30) days must meet the requirements for Limited Outdoor Storage pursuant to the requirements in § 25-303(K) or obtain a Special Use Permit for General Outdoor Storage pursuant to the requirements of § 25-304(B)." *Id.* Outside of this requirement, the ordinance provides no requirement that parking spots be designated for vehicle service customers nor the cars being serviced. Augusta County Ordinance § 25-302(T). Thus, consistent with the text of the ordinance, MAD Properties was only required to act specifically in regard to "vehicles awaiting repair." *Id.*

This conclusion is also supported by a review of other pertinent portions of the Zoning Ordinance. The ordinance requires customer parking to be delineated for "[v]ehicle sales lots." Augusta County Ordinance § 25-303(I)(3). It also requires "vehicle impoundment yard[s]" to be similarly delineated. Augusta County Ordinance § 25-303(I)(4). In terms of governing which types of vehicles may park in what spots, the ordinance only provides that "inoperable motor vehicles" are required to be in the delineated impoundment "yard . . .", *id.*; "lot," Augusta County Ordinance § 25-58; or "Limited Outdoor Storage," Augusta County Ordinance § 25-303(K), depending on which administrative permit is applicable. As a result, these sections

further suggest that *inoperable vehicles*, not operable vehicles, are what is governed elsewhere in the ordinance.

Finally, the site plan submitted by Baber included designated parking for its retail sales use and for vehicle sales. Under the principle of expressio unius est exclusio alterius, "if a [written instrument] covers particular or express matters, the intention may be inferred to exclude other subjects which the general words of the [instrument] may [otherwise] have been sufficient to include." *Yukon Pocahontas*, 181 Va. at 203 (quoting 16 Am. Jur., at 537). Applying this principle here, it is clear both from the site plan and the ordinance text that operable vehicles were not confined to parking in the spots Baber designated in accordance with the administrative permit under Augusta County Ordinance § 25-31. By omitting vehicle services from the site plan, which could have otherwise been included as a part of approving the permit, this use was not limited by the site plan's parking designations. Thus, the parking space designation contained within the site plan applies to either vehicles for sale or inoperable vehicles parked on the property, not operable vehicles parked on the property awaiting vehicle repair.

### 2. The circuit court did not err by interpreting "inoperable motor vehicle[s]" to be distinct from "vehicles awaiting repair."

MAD Properties contends that the circuit court erred by interpreting the term "vehicles awaiting repair" contained within Augusta County Ordinance § 25-302(T) to be distinct from "inoperable motor vehicles" as mentioned in another section of the ordinance. In support, MAD Properties contends that the specific language contained within that section applies to the property, without consideration of other ordinance sections, on the basis of the rule against surplusage and the canon of expressio unius est exclusio alterius. We disagree.

The Supreme Court of Virginia has defined "repair" as "to fix or 'restore . . . what is torn or broken.'" *Montgomery v. Columbia Knoll Condominium Council of Co-Owners*, 231 Va. 437, 439 (1986) (quoting *Repair*, *Webster's Third New International Dictionary* (1981)). Consistent

- 30 -

with the dictionary definition, to "repair" a vehicle is to "restore [the vehicle] by replacing a part or putting together what is torn or broken to restore [it] to a sound or healthy state.'" *Repair*, *Webster's Third New International Dictionary* 1923 (1961).

Since the term is undefined, we interpret the term "motor vehicle awaiting repair," in County Ordinance § 25-302(T) to include motor vehicles "waiting" on the property to be "restore[d] . . . to a sound or healthy state" by applying its dictionary definitions. *Webster's Third New International* Dictionary 152, 1923 (1993); *see, e.g.*, *Eley*, 70 Va. App. at 16. This term's "plain and natural" meaning provides no base condition for the vehicles in question, and we decline to infer one. *Archie*, 296 Va. at 9. Thus, a completely destroyed vehicle and a vehicle seeking minor repairs would both be considered "motor vehicle[s] awaiting repair."

Next, parsing the County's "inoperable vehicle" definition, we draw the following conclusions. First, as the definition of "inoperable motor vehicle" applies to "[a]ny motor vehicle," it follows that the County would only be required to prove one of the conditions that followed to prove that a vehicle is "inoperable." Augusta County Ordinance § 25-4; *see, e.g.*, *Botkin*, 296 Va. at 314-15. Hence, the vehicles documented on the subject property would be "inoperable" per this ordinance if they 1) "[did] not have valid license plates and valid inspection decals, unless exempt by Augusta County or state law; 2) "[were] not in operating condition"; or 3) "[h]a[d] been partially or totally wrecked, or partially or totally disassembled . . . for a period of sixty (60) days or longer." Augusta County Ordinance § 25-4.

In construing these definitions, the circuit court was correct to conclude that "[a]lthough there can be overlap, 'inoperable motor vehicle' is a specifically-defined technical term in the . . . Ordinance and is distinguishable from a vehicle that simply needs to be repaired." Consistent with its definition, a "vehicle awaiting repair" could be a vehicle needing a routine oil change or tire rotation. It could also be a vehicle that was entirely destroyed by an accident. If the initial

vehicle has otherwise been inspected and tagged and has been neither wrecked nor disassembled and is in operating condition, though it "awaits repair," it would not violate the ordinance as it would not meet the definition of "inoperable motor vehicle." In short, "vehicle awaiting repair" encompasses both operable and inoperable vehicles. As a result, MAD Properties' argument is misguided since these conditions can be read separately. In other words, we conclude that a "vehicle awaiting repair" could still violate the ordinance if it was on the property in an "inoperable" condition.[20]

If we were to adopt MAD Properties' construction of the term "awaiting repair" as a condition that prevents the application of the prohibition against inoperable vehicles, that interpretation would render the explicitly defined "inoperable motor vehicle" term's application "useless" as it would negate the ordinance sections enumerating storage requirements for such vehicles. *Herrington*, 71 Va. App. at 661 (quoting *Antisdel*, 279 Va. at 48). Thus, contrary to MAD Properties' assertion, the term "inoperable motor vehicle" "addresses the same issue" as the term "vehicle awaiting repair," as the term "inoperable motor vehicle" is a specifically defined term and the term "vehicle awaiting repair" is a general term, and "where they conflict, [the inoperable motor vehicle definition] prevails." *Chesapeake Hosp. Auth. v. State Health Comm'r*, 301 Va. 82, 96 (2022) (quoting *Va. Dep't of Health v. Kepa, Inc.*, 289 Va. 131, 142 (2015)). And finally, "the time-honored principle *expressio unius est exclusio alterius*," *Miller & Rhoads*, 292 Va. at 544 (quoting *NRV Real Estate, LLC*, 278 Va. at 187-88), cannot save MAD Properties here as this maxim "does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an 'associated group or series,'" *Barnhart*,

---

[20] As a result, we also find MAD Properties' contention that because some of these inoperable vehicles were loaded on roll-backs that they were not in violation of the ordinance misguided. An inoperable vehicle would still be on the property for purposes of the ordinance if it had been brought to the property by roll-back (or tow truck) and to find otherwise would be to imply an omitted exception into the ordinance. *See Jordan*, 138 Va. at 843.

537 U.S. at 168, and the phrase "vehicle awaiting repair" is not part of the group enumerated in Augusta County Ordinance § 25-302(T). Hence, these doctrines do not change our conclusion here. We therefore agree with the circuit court's reading of the ordinance.

### III. CONCLUSION

For the foregoing reasons, we conclude that the circuit court erred in applying the thing-decided doctrine. We hold, consistent with the text of Code § 15.2-2311(A), that the thing-decided doctrine is akin to an administrative preclusion doctrine that encompasses elements of both the failure to exhaust administrative remedies and finality doctrines and applies to decisions made by a zoning administrator. And we further hold that per the Supreme Court's ruling in *Dick Kelly*, this doctrine also applies offensively, permitting the government to preclude the landowner from contending that the property was not in violation.

We note, however, in considering the discretion vested in the landowner to choose whether to appeal these decisions or correct these violations that this doctrine's offensive application is limited to cases factually similar to *Dick Kelly*. The circuit court's opinion erred by deviating from this legislatively and precedentially prescribed procedure as a matter of law. We also find that, for purposes of remand, the circuit court erred in interpreting the site plan to exclude MAD Properties from parking cars on the property for its by-right vehicle service use. But also, we find that the circuit court did not err in interpreting the ordinance. Therefore, we reverse the circuit court's judgment for further proceedings consistent with this opinion.

*Reversed and remanded.*